**U.S. DISTRICT COURT**

**FILED**

NOV **1 9** 2020

Clerk, U.S. District Court
Eastern District of Texas

**EASTERN DISTRICT OF TEXAS**

Mr. Michael Moates, individually and on behalf of DC Chronicle, a 501(c)3 non-profit charity organization

            Plaintiffs,
    v.

Facebook Inc., Facebook Payments Inc, Mark Zuckerberg, as Chief Executive Officer, Sheryl Sandberg, as Chief Operating Officer

            Defendants.

Case No.:   **4:20cv896-ALM-KPJ**

**COMPLAINT**

**JURY TRIAL DEMANDED**

Judge:

Date Action filed:
Date set for trial:

## I. NATURE OF THE CASE

1. Plaintiff Michael Moates brings this action individually and on behalf DC Chronicle. These plaintiffs (collectively referred to as "Plaintiffs") bring this action against Defendants Facebook Inc, Facebook Payments Inc, Mark Zuckerberg, and Sheryl Sandberg (hereinafter referred to collectively as "Defendants," or individually by their respective acronyms). This complaint seeks equitable and injunctive relief for the disabling of Michael Moates' Facebook, Messenger, Instagram Accounts, CrowdTangle, all pages and groups connected to these accounts, and the disabled features on the Oculus Go Device (hereinafter referred to collectively as "Products,".) This includes the data that is stored on the servers that the refuse to release to the Plaintiff. This complaint also seeks damages for fraudulent and unauthorized charges or attempted charges after products were disabled, loss of wages due to deactivation, and fraudulent advertising.

## II. JURISDICTION and PARTIES

2. Defendants Michael Moates resides does business with principal places of business in Denton, Texas. The amount in controversy exceeds $75,000. Therefore, jurisdiction of this court is proper.

## III. FACTUAL ALLEGATIONS

3. Since August 29th, the Plaintiff has invested $10,546 on advertising with Facebook Inc. to build a following through "likes" on multiple of his pages that allow him to earn income via engagement of posts. Reach is determined by number of followers and likes. When someone spends money to build an audience they invest and that money is returned through different types of engagements.

4. On October 7th, 2020, the defendant received an email message and notification on the Facebook website stating that he was not following community standards. The Plaintiff, unsure of what he did wrong immediately reached out to Facebook Support. Facebook Support responded that his page was "in good standing," acknowledged that this "may have cause confusion" for the Plaintiff and instructed him "have this reported as a bug."

5. On October 20th, 2020, the Defendants disabled access to the defendants Facebook and Facebook Business Manager Account (which included Creator Studio, Pages, and Ads). This was done without any notification or explanation and the Plaintiff was made aware when he attempted to access his account, he saw a message that read "For more information, or if you think your account was disabled by mistake, please visit the Help Center," on Facebook

6. Shortly thereafter, the Plaintiff's Instagram was disabled and a message appeared, "Thanks for Providing Your Info. We'll review your info and if we can confirm it, you'll be able to request a review in the Help Center within approximately 24 hours," on Instagram.

7. Subsequently, the Plaintiff was unable to access his Oculus and Crowd Tangle accounts due to Facebook disabling Facebook login.

8. After all of this took place on October 20th, 2020, the Plaintiff reached out to Carolyn Everson (Vice President, Facebook) who said she "So sorry this happened" and "hoping for some resolution." She included two of her staff members Meghan Orbe and Conrad Gibson on her email. Conrad responded very quickly asking for some details and said "I'll be in touch once I have an update from the account team." Conrad responded two days later stating "Apologies for the delay as I worked with our team on your request. I heard back this morning and it seems that your accounts were disabled permanently and, due to policy guidelines, they are unable to share why the accounts were deactivated. I am so sorry this happened to you. I asked for more information, but they were unable to share with me. I wish I could give you a better explanation, but unfortunately, we have these rules in place to protect a user's privacy. I know that you had a lot of photos saved to your accounts that you wanted to access. They provided me with the following information on how to request data from a closed account." The links Conrad provide were broken and did not work. The Plaintiff subsequently reached out and was given a new link. Upon filling out the request in the new link for his data Facebook said "The Facebook account associated with the email address you provided to us has been disabled for violation of our Terms of Service." They did not provide the data they admit belongs to him.

9. After getting no resolution from Carolyn Everson and her team, on October 23, 2020, the Plaintiff reached out to Fidji Simo (Head of Facebook, Facebook Inc.). He explained the situation again and she said "I want to look into why that happened" and again her colleague would follow up "Priya will follow up." Priya emailed that same day saying "Will have some

more info shortly - thanks for your patience here!" To date, she has never followed up with the Plaintiff.

10. Less than a month and a half after initial Facebook ads were bought to invest in a business page following and audience Facebook disabled the account after making over $10,000 from the Plaintiff.

11. The 2 days before Facebook disabled the account, they charged the Plaintiff $1,421 for an audience they took away less than 48 hours after.

12. The Defendants have a history of disabling accounts without any explanation.

13. The Defendants has not shown that the Plaintiff violated any rules on each platform that he was banned from.

13. The Defendants have a history of selectively enforcing their terms of service and community standards or updating them so that it benefits them for profit. For example, in April of 2012 the Ad Guidelines said "Ads must not promote the sale of prescription pharmaceuticals[1]" but that was quickly changed so the Defendants could profit from big pharmaceutical companies such as Vyvanse[2].

14. The Plaintiff's ask the court to consider the Defendants protected under Section 230 of the Communications Decency Act. They are no longer a distributor of information, but they selectively publish their own information. The employee third party fact-checkers that they pay and then promote on the platform. This makes them a publisher not simply a platform.

15. Facebook admits in terms of service that "guarantee it" {keeping Facebook safe}.

---

[1] https://archive.is/V8iS4#selection-1699.7-1699.68
[2] https://www.facebook.com/ads/library/?active_status=all&ad_type=all&country=US&view_all_page _id=2577210512505316&sort_data[direction]=desc&sort_data[mode]=relevancy_monthly_grouped

1

## IV. CAUSES OF ACTION

2

## FIRST CAUSE OF ACTION

3

### <u>Fraud</u>

4

5        14. From August to October the Plaintiff spent $10,546 on advertising with Facebook

6   Inc.

7        15. The Defendants advertised these ads as giving the Plaintiff the ability to get people

8   "engage with your posts through comments, shares and likes." They disabled his account so he

9

10  could not get this benefit but still charged him.

11       16. The Defendants committed a second type fraud. They did so by placing ads in front of

12  the Plaintiff that caused him to follow certain pages that have now lost their investment from the

13

14  advertisement he clicked on.

15

## SECOND CAUSE OF ACTION

16

### <u>Strict Tort Liability</u>

17

18       16. The aforementioned banned accounts caused the Plaintiff to lose his audience and

19  revenue from said audience.

20       17. The aforementioned banned accounts caused the Plaintiff to lose value in his Oculus

21

22  device he purchased from the company.

23       18. The banned accounts has caused the Plaintiff emotional distress including anxiety and

24  depression due to loss of all data, revenue, and communications.

25

26

27

28

**THIRD CAUSE OF ACTION**

**Violation of Civil Rights**

19. The Plaintiff suffers from Anxiety and Depression. The Defendants violated the Americans with Disabilities Act when they did not provide reasonable accommodations and discriminated against the Plaintiff by the choosing to exclude and segregate him without cause. To date, they have no policies or procedures in place for those with mental health issues that are covered under the ADA laws.

**FOURTH CAUSE OF ACTION**

**Violation of Anti-Trust Laws**

20. The Sherman Act also makes it a crime to monopolize any part of interstate commerce. An unlawful monopoly exists when one firm controls the market for a product or service, and it has obtained that market power. Defendants' has acquired multiple companies in violation of anti-trust laws in order to dominate the market. They acquired Instagram, WhatsApp, CrowdTangle, Giphy, Oculus, and others.

21. This is shown in their behavior when the not only disabled the Facebook account of the Plaintiff but his Instagram, Crowdtangle, and Oculus accounts.

22. They violated the Clayton Act which says it prohibits mergers or acquisitions that are likely to lessen competition. This happened when Facebook purchased Instagram.

**FIFTH CAUSE OF ACTION**

**Data Theft**

23. Defendants claim "You can download a copy of your data at any time" in their terms of service. However, this is not true. They have stolen and hijacked the Plaintiffs data across all of the platforms.

24. Again, Defendants has manipulated its Terms of Service which used to state "you own all of the content and information you post on Facebook, and you can control how it is shared.[3]" The removed this sometime between March 2018 and September 2020.

25. Defendants engaged in "largest known leak in Facebook history[4]" by giving access to Plaintiffs personal private data to Cambridge Analytica.

## SIXTH CAUSE OF ACTION

### Violation of Contract (Terms of Service)

26. Defendants violated their own terms of service[5] when they allowed high profile sex offenders to join[6][7][8].

27. Defendants violated their own terms of service when they allowed illegal multi-level marketing pyramid schemes on Facebook[9].

28. Defendants violated their own terms of service by allowing people "transfer your account (including any Page or application you administer) to anyone without first getting our written permission."

29. Defendants violated their own terms of service by allowing people to "bully, intimidate, or harass any user."

---

[3] https://www.latimes.com/business/lazarus/la-fi-lazarus-facebook-cambridge-analytica-privacy-20180320-story.html#:~:text=The%20reality%20is%3A%20Your%20data,free%2C%E2%80%9D%20said%20Scott%20I.

[4] https://www.nytimes.com/2018/04/04/us/politics/cambridge-analytica-scandal-fallout.html

[5] https://web.archive.org/web/20140526070122/https://www.facebook.com/terms.php

[6] https://www.facebook.com/billcosby

[7] https://www.facebook.com/miketyson

[8] https://www.facebook.com/tupacshakur/

[9] https://www.facebook.com/advocare/

30. Defendants violated their own terms of service by allowing content that is "hate speech, threatening, or pornographic; incites violence; or contains nudity or graphic or gratuitous violence."

31. Defendants violated their own terms of service by doing actions that are "unlawful, misleading, malicious, or discriminatory."

32. Defendants violated their own terms of service by allowing content that is a violation of intellectual property laws.

33. Defendants violated their own community standards by allowing violence and threats. Including messages to the Plaintiff telling him to "kill himself."

34. Defendants violated their own community standards by allowing bullying and harassment, hate speech, graphic content, nudity and pornography, and spam.

35. Defendants violated their own community standards by disabling the Plaintiff's account claiming he violated community standards when in fact he did not.

**Punitive Damages**

33. The conduct of Defendants described above is outrageous. Defendants' conduct demonstrates a lack of respect for the law and shows that they are interested in only earning a profit. They have committed theft, fraud, civil rights violations, and many other violations of the law.

## V. PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully pray for a judgment against Defendants for:

1.  Injunctive and equitable relief as the Court deems appropriate including:
Requiring Defendant reactivate all accounts on the products; and

2.  Compensatory damages to be paid by all Defendants, according to proof at trial;

3.  Punitive damages as the court deems appropriate;

4.  Any other relief as the court deems appropriate.

Dated: 19 Nov 20

Michael Moates
Pro Se
2700 Colorado Blvd # 1526
Denton, TX 76201