# IN THE UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF TEXAS
# SHERMAN DIVISION

| | | |
|---|---|---|
| **MICHAEL MOATES,** | § | |
| Plaintiff, | § § § | |
| v. | § § | Civil Action No.: 4:20-cv-896-ALM-KPJ |
| **FACEBOOK INC.,** | § § § | |
| Defendant. | § § § | |

## MEMORANDUM OPINION AND ORDER

Pending before the Court is Plaintiff Michael Moates' ("Plaintiff") Emergency Motion for Temporary Restraining Order (the "Motion") (Dkt. 6), wherein Plaintiff seeks both a temporary restraining order ("TRO") and a preliminary injunction against Defendant Facebook Inc. ("Facebook"). On December 11, 2020, Facebook filed a response (Dkt. 10), to which Plaintiff filed a reply (Dkt. 14). On January 13, 2021, the Court held a hearing (the "Hearing"), during which the parties presented oral argument. *See* Dkt. 24. Having considered the pleadings, applicable authorities, and arguments, the Court finds the Motion (Dkt. 6) is hereby **DENIED**.

### I.  BACKGROUND

#### A.  FACTUAL BACKGROUND

On November 19, 2020, Plaintiff, proceeding *pro se*, filed an Original Complaint (Dkt. 1) against Facebook. Six days later, Plaintiff filed a First Amended Complaint (Dkt. 5) and the present Motion (Dkt. 6), requesting a temporary restraining order and a preliminary injunction. The First Amended Complaint was subsequently superseded by a Second Amended Complaint (Dkt. 20), which contains additional allegations and two hundred seventy-eight (278) pages of exhibits. *See*

Dkt. 20, Exs. 1–22. Plaintiff also introduced new factual representations during the Hearing. *See* Dkt. 24. To provide the most complete picture of the allegations at hand, the Court draws from the Second Amended Complaint and Plaintiff's statements made during the Hearing. *See* Dkts. 20, 24.[1]

Plaintiff represents he maintains a number of pursuits: conducting multiple businesses, working with a non-profit charity foundation, fundraising, pursuing a Doctor of Education (EdD) degree, and moderating Facebook Pages and Groups. *See* Dkt. 24. To earn income, Plaintiff states he works in "side journalism," through which he, as an independent contractor, writes articles for various clients, such as the *Washington Examiner*. *See id.* Plaintiff alleges he maintains accounts on various platforms: Facebook, Facebook Messenger, Instagram, WhatsApp, Oculus, and CrowdTangle, some of which he uses to communicate with his client base.[2] *See id.*; Dkt. 20 at 9. Plaintiff further asserts he relies on the "Facebook Login" feature to register accounts and access third-party websites.[3] *See* Dkt. 20 at 11.

---

[1] Plaintiff's Original Complaint and First Amended Complaint initially named three other defendants—Facebook Payments, Inc., Mark Zuckerberg, and Sheryl Sandberg. *See* Dkts. 1, 5. Plaintiff also filed suit on behalf of a co-plaintiff, D.C. Chronicle. *See id.* Because these four parties are no longer a part of in this lawsuit, they will not be further discussed herein. *See* Dkts. 15, 17, 20.

[2] Facebook is primarily a social networking website, although it provides other services. *See Facebook, Inc. v. Teachbook.com LLC*, 819 F. Supp. 2d 764, 769 (N.D. Ill. 2011). Facebook Messenger and WhatsApp (acquired by Facebook in 2014) are instant messaging platforms. *See United States v. Shipp*, 392 F. Supp. 3d 300, 308 (E.D.N.Y. 2019); *Reveal Chat Holdco, LLC v. Facebook, Inc.*, 471 F. Supp. 3d 981, 989 (N.D. Cal. 2020). Instagram is a photograph- and video-sharing social media platform acquired by Facebook in 2012. *See Sinclair v. Ziff Davis, LLC*, 454 F. Supp. 3d 342, 343 (S.D.N.Y. 2020); *Reveal Chat*, 471 F. Supp. 3d at 989. Oculus VR, LLC was a virtual reality technology company acquired by Facebook. *See ZeniMax Media, Inc. v. Oculus VR, LLC*, 166 F. Supp. 3d 697, 702 (N.D. Tex. 2015). CrowdTangle is an analytics tool that tracks how content spreads throughout the Internet, purchased by Facebook in 2016. *See* Jacquellena Carrero, Note, *Access Granted: A First Amendment Theory of Reform of the CFAA Access Provision*, 120 COLUM. L. REV. 131, 132 (2020); Davey Alba, *The Facebook Pages with the Largest Share of Debate Conversation*, N.Y. TIMES (Sept. 29, 2020), https://www.nytimes.com/2020/09/29/technology/the-facebook-pages-with-the-largest-share-of-debate-conversation.html; Casey Newton, *Facebook Buys CrowdTangle, the Tool Publishers Use to Win the Internet*, THE VERGE (Nov. 11, 2016), https://www.theverge.com/2016/11/11/13594338/facebook-acquires-crowdtangle.

[3] *See* Lina M. Khan & David E. Pozen, *A Skeptical View of Information Fiduciaries*, 113 HARV. L. REV. 497, 528 n.143 (2019) (noting Facebook serves "as a central passport to the [I]nternet, such that one's Facebook login can serve as a credential for numerous third-party sales.").

As an additional source of income, Plaintiff represents he operates online Facebook Pages and Groups, through which he facilitates "likes, followers, and engagement." *See* Dkt. 20 at 9; *see also* Dkt. 10-14 (screenshot of a public Facebook Group named "Donald J. Trump Administration News").

Sometime in 2020, Plaintiff "invested" $10,546.00 in advertising "to build a following" of Facebook users who would like, follow, and engage with content hosted by the social media platform: "When someone spends money to build an audience[,] they invest, and that money is returned through different types of engagements. In this case, the Plaintiff used the Facebook ad system for their Engagement ad." *Id.*; *see also* Dkt. 20-10 (copy of receipt, which reflects Facebook charged Plaintiff for advertising targeted towards groups labeled "Misc. Freedom," "Conservative Engagement," and "DJT, GOP, Moderate").

On October 7, 2020, an email notified Plaintiff that an entity affiliated with him, "DC Chronicle News," did not comply with Facebook's Community Standards:

> It's against our standards to mislead people or Facebook by things like:
>
> - Misrepresenting your Page's identity or purpose.
> - Using multiple Facebook accounts or sharing accounts between multiple people.
> - Creating new accounts or taking other actions to avoid restrictions on posting, commenting or sharing too much.
> - Making it difficult to know your content's origin or making your content seem more popular than it is.

Dkt. 20 at 10; Dkt. 20-3 (punctuation added). Thirteen days later, Plaintiff's Facebook and Instagram accounts were disabled. *See* Dkt. 20 at 10–11; Dkt. 20-5. Because Plaintiff's ability to log into Facebook Messenger, Oculus, CrowdTangle, and other platforms depends on an active Facebook account, Plaintiff also lost access to these websites and applications. *See* Dkt. 20 at 11.

3

Plaintiff then contacted multiple Facebook representatives, from whom he eventually learned the alleged reason for his deactivation:

> We will remove any Facebook Pages, Groups and Instagram accounts representing QAnon, even if they contain no violent content. This is an update from the initial policy in August that removed Pages, Groups and Instagram accounts associated with QAnon when they discussed potential violence while imposing a series of restrictions to limit the reach of other Pages, Groups, and Instagram accounts associated with the movement. Groups and Instagram accounts that represent an identified Militarized Social Movement are already prohibited. And we will continue to disable the profiles of admins who manage Pages and Groups removed for violating this policy, as we began doing in August.

Dkt. 20-18; *see* Dkt. 20 at 11–13.[4] Plaintiff admits he "had a page titled QAnon," but it "had no QAnon content on it and was inactive." Dkt. 20 at 13. Plaintiff alleges that, in mid-October, prior to his deactivation, he "in good faith" attempted to delete the QAnon page to follow Facebook's policy, contending he "ultimately had his account disabled even though he was attempting to comply with [Facebook's] policies." *Id.* at 14.

In addition to these allegations, Plaintiff takes issue with Facebook's acquisition of technology companies such as Instagram, WhatsApp, Oculus, CrowdTangle, and Giphy. *See* Dkt. 20 at 21. He alleges:

> To date, Facebook hold[s] monopoly power in the market for social media. . . . [Facebook is] using anti-competitive practices to obtain total control of the market. . . . The Plaintiff has been harmed by these actions. As you can see above[,] due to Facebook dominating the market[,] the Plaintiff is unable to use certain products because Facebook has blacklisted him across multiple platforms. Facebook has also changed the status quo to make services blocked by people they blacklist.

Dkt. 20 at 22.

---

[4] According to the United States House of Representatives' Resolution 1154, QAnon "is a movement promoting a collection of unfounded conspiracy theories that have spread widely on the [I]nternet since 2017." Condemning QAnon and Rejecting the Conspiracy Theories It Promotes, H.R. 1154, 116th Cong. (2020); *see also Doe v. Google, LLC*, No. 20-cv-07502-BLF, 2020 WL 6460548, at *2 (N.D. Cal. Nov. 3, 2020).

Plaintiff also contends he needs access to "business data" that Facebook provides. *See* Dkt. 24. Such business data allegedly encompasses the contact information of users, the number of active users, and engagement metrics. *See id.* Plaintiff avers he needs this information to conduct his businesses and to complete his doctoral coursework, as he allegedly uses such data to secure work and write term papers. *See id.*

### B.  PROCEDURAL HISTORY

On November 19, 2020, Plaintiff filed an Original Complaint (Dkt. 1) against Facebook, wherein Plaintiff alleges Facebook defrauded Plaintiff twice, is strictly liable in tort, violated the American Disabilities Act, violated the Sherman and Clayton Acts, committed data theft, and breached its contract(s) with Plaintiff. *See id.* Thirteen days later, Plaintiff filed a First Amended Complaint (Dkt. 5) and the present Motion (Dkt. 6), which seeks emergency injunctive relief based solely on his Sherman Act claim: "This motion is made on the grounds that . . . [Plaintiff] is likely to succeed on the merits of [his] claims that Facebook's conduct violates [the] Sherman Act." Dkt. 6 at 1; *see* Dkt. 24 (confirming, on the record, Plaintiff's Motion for a TRO and preliminary injunction is based solely on his Sherman Act claim).

Based on Plaintiff's Motion and statements made at the Hearing, Plaintiff urges the Court to enter the following forms of injunctive relief:

(1) Facebook shall reinstate Plaintiff's access to "all accounts[,] including Facebook App, Instagram, Messenger, CrowdTangle, Oculus and all associated features;"

(2) Facebook shall be enjoined from disabling any access to Plaintiff's accounts until such time as a judge can make an order on the injunction;"

(3) Facebook and its employees shall be "restrain[ed]" from "taking any adverse action against Plaintiff;"

(4) Facebook shall provide Plaintiff "the data;" and

(5) "[A]nother order basically stating that due to the fact that [Plaintiff] is a shareholder, information that needs to be provided to [Plaintiff] that would not otherwise be available to [him]."

Dkt. 6 at 1 (first three prayers for injunctive relief, as stated in the Motion); Dkt. 24 (last two prayers for injunctive relief, as stated during the Hearing).

Pursuant to 28 U.S.C. § 636, Plaintiff consented to proceed before the undersigned United States Magistrate judge for all proceedings in this matter including, but not limited to, the Motion. *See* Dkt. 4. Facebook consented to have the undersigned rule on the Motion with final authority. *See* Dkt. 23.

## II.     LEGAL STANDARD

Injunctive relief is an extraordinary remedy that requires the applicant to unequivocally show the need for its issuance. *See Valley v. Rapides Parish School Bd.*, 118 F.3d 1047, 1050 (5th Cir. 1997). Courts in the Fifth Circuit have made clear that preliminary injunctions and temporary restraining orders constitute "extraordinary and drastic remed[ies]," which are "not to be granted routinely, but only when the movant, by a clear showing, carries the burden of persuasion." *White v. Carlucci*, 862 F.2d 1209, 1211 (5th Cir. 1989); *see also Albright v. City of New Orleans*, 46 F. Supp. 2d 523, 532 (E.D. La. 1999) ("Temporary restraining orders and preliminary injunctions are extraordinary relief and rarely issued.").

To obtain such relief, a party seeking a temporary restraining order ("TRO") and/or preliminary injunction must demonstrate: (1) a substantial likelihood of success on the merits; (2) a likelihood the movant will suffer irreparable harm in the absence of preliminary relief; (3) that the balance of equities tips in the movant's favor, and (4) that an injunction is in the public interest. *See Texas Midstream Gas Servs., LLC v. City of Grand Prairie*, 608 F.3d 200, 206 (5th Cir. 2010) (quoting *Winter v. Natural Res. Def. Council*, 555 U.S. 7, 21 (2008)); *Palmer v. Waxahachie Indep.*

*Sch. Dist.*, 579 F.3d 502, 506 (5th Cir. 2009); *Nichols v. Alcatel USA, Inc.*, 532 F.3d 364, 372 (5th Cir. 2008); *Mississippi Power & Light Co. v. United Gas Pipe Line Co.*, 760 F.2d 618, 621 (5th Cir. 1985). The movant bears the burden to prove all four requirements in order to be entitled to injunctive relief. *Palmer*, 579 F.3d at 506. The denial of a TRO or preliminary injunction will be upheld where the movant has failed to sufficiently establish any one of the four criteria. *Black Fire Fighters Ass'n v. City of Dallas, Tex.*, 905 F.2d 63, 65 (5th Cir. 1990).

### III.  ANALYSIS

Plaintiff's Motion cites eight cases, which, collectively, analyze antitrust claims under both Sections 1 and 2 of the Sherman Act.[5] Accordingly, the Court addresses whether a TRO and/or preliminary injunction are justified under either Section.

Herein, the Court discusses only the first two prongs considered for preliminary injunctive relief: Plaintiff's likelihood of succeeding on the merits with respect to his claims under Sections 1 and 2 of the Sherman Act; and Plaintiff's likelihood of experiencing irreparable harm in the absence of injunctive relief. Ultimately, the Court finds Plaintiff has not met his burden under either prong. As such, the Court need not address the third and fourth prongs of a preliminary injunction analysis—the balance of the equities and the public interest. *See Barton v. Huerta*, 613 F. App'x 426, 427 (5th Cir. 2015) ("[F]ailure to succeed on any one of the elements results in denial of injunctive relief.").

---

[5] Plaintiff's Motion cites the following legal authorities, *see* Dkt. 6 at 2, only one of which is binding on this Court: *Brown Shoe Co. v. United States*, 370 U.S. 294 (1962); *Aerotec Int'l, Inc. v. Honeywell Int'l, Inc.*, 836 F.3d 1171 (9th Cir. 2016); *Boardman v. Pacific Sea Grp.*, 822 F.3d 1011 (9th Cir. 2016); *Cascade Health Sols. v. PeaceHealth*, 515 F.3d 883 (9th Cir. 2005); *Bernhardt v. Los Angeles Cnty.*, 339 F.3d 920 (9th Cir. 2003); *United States v. Microsoft Corp.*, 253 F.3d 34 (D.C. Cir. 2001); *Datagate, Inc. v. Hewlett-Packard Co.* 60 F.3d 1421 (9th Cir. 1995); *Aya Healthcare Servs., Inc. v. AMN Healthcare Inc.*, No. 17-cv-205-MMA (MDD), 2018 WL 3032552 (S.D. Cal. June 19, 2018).

### A. SUBSTANTIAL LIKELIHOOD OF SUCCEEDING UNDER SECTION 1 OF THE SHERMAN ACT

Section 1 of the Sherman Act prohibits "[e]very contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States." 15 U.S.C. § 1. Despite the breadth of the statutory language, the United States Supreme Court "has long recognized that Congress intended to outlaw only unreasonable restraints." *State Oil v. Khan*, 522 U.S. 3, 10 (1997). Thus, to establish a claim under Section 1, a plaintiff must show that the defendant (1) engaged in a conspiracy (2) that restrained trade (3) in a particular market. *MM Steal, LP v. JSW Steel (USA) Inc.*, 806 F.3d 835, 843 (5th Cir. 2015). The Court addresses only the third element of Plaintiff's Section 1 claim—a "particular market."[6]

A "particular market" in an antitrust suit "is composed of products that have reasonable interchangeability for the purposes for which they are produced—price, use and qualities considered." *United States v. E. I. du Pont de Nemours & Co.*, 351 U.S. 377, 404 (1956). Essentially, the relevant market is the area of effective competition—the arena in which significant substitution in consumption or production occurs. *Ohio v. American Express Co.*, 138 S. Ct. 2274, 2285 (2018). "Without a definition of a relevant market, there is no way to measure a defendant's ability to lessen or destroy competition." *Academy of Allergy & Asthma in Primary Care v. Louisiana Health Serv. & Indem. Co.*, No. 18-399, 2020 WL 4050243, at *9 (E.D. La. July 17, 2020).

---

[6] To support the first two elements—that Facebook engaged in a conspiracy that restrained trade—Plaintiff attaches the original complaints filed in *United States v. Facebook, Inc.*, No. 1:19-cv-2184-TJK, Dkt. 1 (D.D.C. July 24, 2019); *State of New York v. Facebook, Inc.*, No. 1:20-cv-3589-JEB, Dkt. 4 (D.D.C. Dec. 9, 2020); *Federal Trade Comm'n v. Facebook, Inc.*, No. 1:20-cv-3590-JEB, Dkt. 3 (D.D.C. Dec. 9, 2020). *See* Dkt. 6, Exs. 20–22. Because Plaintiff has not shown he is likely to succeed on the issue of a relevant market, the Court does not address whether these complaints, and the exhibits attached thereto, show that Plaintiff is likely to succeed on the merits of the first two elements of Plaintiff's Section 1 claim. *See Barton*, 613 F. App'x at 427 ("[F]ailure to succeed on any one of the elements results in denial of injunctive relief."); *cf. Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (noting, in the context of a motion for summary judgment, a party that fails to carry its burden on an essential element "necessarily renders all other facts immaterial.").

The plaintiff bears the initial burden to prove the defendant's activities produce a substantial anticompetitive effect that harms consumers in the relevant market. *See American Express*, 138 S. Ct. at 2284. "Where the plaintiff fails to define its proposed relevant market with reference to the rule of reasonable interchangeability and cross-elasticity of demand . . . the relevant market is legally insufficient. . . ." *PSKS Inc. v. Leegin Creative Leather Prods., Inc.*, 615 F.3d 412, 418 (5th Cir. 2010).

Accordingly, the plaintiff must establish a "relevant market" by identifying two components: a product market and a geographic market. *Id.* "If two products share a high cross-elasticity of demand—in that an increase in the price of one product causes consumers to switch to the other, and vice versa—then those products likely are interchangeable and may properly be considered part of the same product market." *Buccaneer Energy (USA) Inc. v. Gunnison Energy Corp.*, 846 F.3d 1297 (10th Cir. 2017); *see also Spectrofuge Corp. v. Beckman Instruments, Inc.*, 575 F.2d 256, 277 n.75 (5th Cir. 1978).[7]

Where customers are willing to obtain the product or service from another geographic area in response to price changes, the locations may be considered as part of the same geographic market. *See* Kathryn Conde & Matthew Ritchie, *Antitrust Considerations*, *in* ADVISING A MASS. BUS., MASS. CONTINUING LEGAL EDUC., Ch. 11 § 11.2.1(a) (2011). Accordingly, "[t]he area of effective competition . . . must be charted by careful selection of the market area in which the seller operates and to which buyers can turn for supplies." *Apani Sw., Inc. v. Coca-Cola Enters., Inc.*, 300 F.3d 620, 626 (5th Cir. 2002). The geographic market must correspond to "the commercial realities" of an industry and be "economically significant." *Id.* (quoting *Brown Shoe Co. v. United*

---

[7] "For example, if the demand for margarine increases 200% when the price of butter increases 100%, the cross-elasticity of demand between margarine and butter is 2. A high cross-elasticity of demand indicates that the products are substitutes; a low cross-elasticity of demand indicates that the products are not substitutes and, as a result, do not compete in the same market." *Lenox v. MacLaren Surgical Corp. v. Medtronic, Inc.*, 762 F.3d 1114 (10th Cir. 2014).

*States*, 370 U.S. 294, 336–37 (1962)). To be "economically significant," the relevant market "must contain an 'appreciable segment of the product market.'" *Id.* (citation omitted). "Whether a segment is 'appreciable' depends upon whether it includes either an appreciable portion of the product market as a whole, or a proportion of the product market which is 'largely segregated from, independent of, or not affected by' competition elsewhere." *Id.* (citation omitted).

Accordingly, defining the relevant market requires some particularity. For example, in cases that have survived a motion to dismiss for failure to state a claim, the plaintiff has defined the relevant market as:

1. "[T]he raw water market in Montgomery County."
2. "[M]arkets for allergy testing and allergen immunotherapy . . . in local areas throughout Louisiana, Kansas, and other local markets serviced by Humana."
3. "[C]ommunity provider[s] of both inpatient and outpatient hospital services in the Thibodaux/Lafourche region [of Louisiana]."
4. "[T]he nationwide market for accelerated vibratory orthodontic devices."
5. The Shreveport-Bossier market for "general acute-care services, primary care, and OB/GYN."

*Quadvest, L.P. v. San Jacinto River Authority*, No. 4:19-cv-4508, 2020 WL 5034155, at *8 (S.D. Tex. Aug. 14, 2020); *Academy of Allergy & Asthma*, 2020 WL 4050243, at *9; *Morice v. Hospital Serv. Dist. #3*, 430 F. Supp. 3d 182, 210 (E.D. La. 2019); *OrthoAccel Techs., Inc. v. Propel Orthodontics, LLC*, No. 4:16-cv-350-ALM, 2017 WL 1213629, at *3–4 (E.D. Tex. Apr. 3, 2017); *BRFHH Shreveport, LLC v. Willis Knighton Med. Ctr.*, 176 F. Supp. 3d 606, 634 (W.D. La. 2016).

After reviewing Plaintiff's Motion (Dkt. 6) and reply (Dkt. 14), the Court is unable to locate a discussion defining a product market, a geographic market, or the statistical economic significance of Plaintiff's journalistic activities. Further, when queried about the relevant market during the Hearing, Plaintiff appeared to define the product market as "content," which the Court

10

construes as Internet posts, which may include "journalism" or "news." *See* Dkt. 24. Plaintiff appears to have paid for advertising specifically targeted to Facebook accounts connected to the following Facebook identifiers: "Misc. Freedom," "Conservative Engagement," and "DJT, GOP, Moderate." *See* Dkt. 20-10. At the Hearing, Plaintiff further stated:

> [Facebook's counsel] said that I am not a competitor of Facebook, which I wholeheartedly disagree with for multiple reasons. I am a publisher. Facebook is a publisher. They employ journalism organizations to write articles. . . . They pay people to write articles that they then promote in their own feed. Those articles are competition [for] what I do. In addition, I provide content. Facebook also provides content that competes with me in their News Feed. That is competition. We do compete. . . . In fact, I would say Facebook has an interest in competing against publishers when they publish things to get their articles seen higher than those of other publishers.

Dkt. 24. During the Hearing, Plaintiff did not define the geographic market, though it appears Plaintiff defines it as the entire United States.

In light of Plaintiff's statements at the Hearing, Plaintiff's Section 1 argument seems to proceed as follows: Facebook's acquisition of technology companies, its News Feed algorithm, its authoring of articles, and its deactivation of Plaintiff's account, collectively, constitutes an unreasonable restraint on trade, as Plaintiff's inability to access Facebook and platforms linked through the "Facebook Login" feature removes his journalistic voice from the nation's market for his articles. *See* Dkt. 24.

Plaintiff's Motion, the two hundred seventy-eight (278) pages of exhibits thereto, and Plaintiff's oral argument provide the Court with little data to ascertain the economic significance or cross-elasticity of Plaintiff's journalistic endeavors in the nation's market—general readers or readers associated with the "Misc. Freedom," "Conservative Engagement," and "DJT, GOP, Moderate" tags. *See* Dkt. 6, Exs. 1–22; Dkt. 24. In seeking emergency injunctive relief, Plaintiff bears the burden of offering the Court evidence germane to the relevant market, such as Plaintiff's

11

market share prior to his accounts' deactivation, how much his clients pay him to write articles, how his client's prices fluctuate in response to Facebook's allegedly anticompetitive conduct, and/or how his client's prices change in response to Plaintiff's "investment" in Facebook advertisements. *See PSKS Inc.*, 615 F.3d at 418. Yet, other than Plaintiff's "investment" of $10,546.00, and the receipt reflecting Plaintiff's payment for targeted advertising, the record is devoid of data touching on these issues. *See* Dkt. 20 at 11.

Having reviewed the record, the Court is unable to assess Facebook's ability to "lessen or destroy" the competitiveness of Plaintiff's voice in the relevant market of "journalism in the United States" or "journalism relevant to users belonging to the 'Misc. Freedom,' 'Conservative Engagement,' and 'DJT, GOP, Moderate'" readerships. *Academy of Allergy & Asthma*, 2020 WL 4050243, at *9. Plaintiff's definition of a "relevant market" and lack of evidence thereof is legally insufficient at this early stage to establish he is substantially likely to succeed on the merits under Section 1 of the Sherman Act.

### B. SUBSTANTIAL LIKELIHOOD TO SUCCEED UNDER SECTION 2 OF THE SHERMAN ACT

"Section 2 of the Sherman Act covers both concerted and independent action, but only if that action 'monopolize[s].'" *OGD Equip. Co. v. Overhead Door Corp.*, No. 4:17-cv-898-ALM-KPJ, 2019 WL 5390590, at *2 (E.D. Tex. Aug. 7, 2019) (citing 15 U.S.C. § 2; *American Needle, Inc. v. National Football League*, 560 U.S. 183, 190 (2010)). To establish a violation under Section 2, the plaintiff must show the defendant: "(1) possesses monopoly power in the relevant market; and (2) acquired or maintained that power willfully, as distinguished from the power having arisen and continued by growth produced by the development of a superior product, business acumen, or historic accident." *Abraham & Veneklasen JV v. American Quarter Horse Ass'n*, 776 F. 3d 321,

334 (5th Cir. 2015) (quoting *Stearns Airport Equip. Co. v. FMC Corp.*, 170 F.3d 741, 744 (5th Cir. 2010)).

Consistent with the Court's discussion above, Plaintiff has not carried his burden at this early stage to define a relevant market, let alone Facebook's monopoly power in that relevant market.[8] *See supra* Section III.A. Because Plaintiff has not satisfied the first element of a Section 2 claim, the Court need not address the second element—whether Facebook acquired its alleged monopoly power willfully.

## C. IRREPARABLE HARM

Even if Plaintiff had demonstrated his substantial likelihood to prevail under Sections 1 and 2 of the Sherman Act, Plaintiff has not established that he is likely to experience irreparable harm in the absence of preliminary injunctive relief. *See Winter*, 555 U.S. at 21.

At the Hearing, Plaintiff identified the following harms: (1) Plaintiff's need to access business data housed on his Facebook accounts and the platforms connected via Facebook Login; (2) Plaintiff's need to access this same information to write his term papers; and (3) Plaintiff's need to moderate his Facebook Groups and Pages, as they may be unfairly punished for violations of Facebook's Community Standards if Plaintiff is not allowed to manage them. *See* Dkt. 24.

### 1. Ability to Conduct Business

With respect to Plaintiff's need to access client information and communications to conduct his businesses—the Court finds these are monetary harms, and hence, not irreparable.

---

[8] The Court notes that under the "monopoly power in the relevant market" analysis, Plaintiff must allege facts relating to the product market, geographic market, and Facebook's market share. *See L.G. Motorsports, Inc. v. NGMCO, Inc.*, No. 4:11-cv-112, 2012 WL 718603, at *7 (E.D. Tex. Mar. 6, 2012) ("[T]he Fifth Circuit holds that, as a matter of law, a market share of less than 50 percent is insufficient for a monopolization claim, but it is not insufficient for an attempted monopolization claim."), *report and recommendation adopted*, 2012 WL 1080924 (E.D. Tex. Mar. 30, 2012) (citations omitted).

13

It is well established that injuries compensable through monetary damages are not irreparable harms. *See Bluefield Water Ass'n, Inc. v. City of Starkville*, 577 F.3d 250, 253 (5th Cir. 2009) (holding there is no irreparable injury where harm is financial, and monetary compensation will make plaintiff whole if plaintiff prevails); *Dennis Melancon, Inc. v. City of New Orleans*, 703 F.3d 262, 279 (5th Cir. 2012) ("[A]n injury is irreparable only 'if it cannot be undone through monetary remedies.'") (quoting *Interox Am. v. PPG Indus., Inc.*, 736 F.2d 194, 202 (5th Cir. 1984)); *see also, ADT, LLC v. Capital Connect, Inc.*, 145 F. Supp. 3d 671, 697 (N.D. Tex. 2015) ("A party sufficiently proves that monetary damages are not adequate when it brings forward evidence, in the form of affidavits, declarations, or any other support, that shows imminent harm that is difficult to quantify.").

Here, should Plaintiff prevail in this lawsuit, the income allegedly lost from his accounts' deactivation could be remedied with monetary damages. Thus, Plaintiff's alleged lost revenue and profits are not irreparable harms. *See Pruvit Ventures, Inc. v. Forevergreen Int'l, LLC*, No. 4:15-cv-571-ALM-CAN, 2015 WL 9876952, at *3 (E.D. Tex. Dec. 23, 2015) (no irreparable injury where movant claimed loss of market share, loss of first-to-market opportunities, and loss of future profits); *Digital Generation, Inc. v. Boring*, 869 F. Supp. 2d 761, 778 (N.D. Tex. 2012) (no irreparable injury where movant speculatively claimed "an enormous threat" to revenues and customer base and the potential of competitors diverting actual and potential customers away from movant).

Moreover, the record at this early stage does not indicate this matter is one of those rare instances in which monetary loss could constitute irreparable harm. *See Bond Pharmacy, Inc. v. AnazaoHealth Corp.*, 815 F. Supp. 2d 966, 976 (S.D. Miss. 2011) ("It is well settled that monetary loss, even where substantial, does not, in and of itself, constitute irreparable harm. Monetary loss

may constitute irreparable harm *only* where the movant's very existence is threatened, i.e., where an act threatens an ongoing business with destruction as opposed to mere disruption.") (citation omitted) (emphasis added). Plaintiff has not put forth any evidence that his businesses would face wholesale destruction.

Further, Plaintiff has not explained why his business can only be conducted through Facebook and affiliated platforms, or which individuals and entities he can only reach by Facebook and the affiliated platforms. Plaintiff's averments raise more questions than answers. One would expect that drafts of news articles to be published are exchanged and revised through email, or a shared drive hosted on the Internet that does not require Facebook login credentials. *See* Dkt. 20-7 (screenshot of emails, sent by Plaintiff from a domain named "thenarrativetimes.org").

Similarly, while compensation could be made through Facebook, Plaintiff must demonstrate he *only* receives compensation through Facebook, and that he could not be paid through another avenue. With respect to business communications, Plaintiff must demonstrate that he can *only* communicate with his clients through Facebook, and that alternative channels of communication, such as telephone, email, text messaging, and other instant messaging platforms are not viable. Ultimately, Plaintiff has failed to provide the Court with enough information to establish he has, or will, suffer irreparable harm with respect to his businesses.

**2. Ability to Complete Coursework**

With respect to Plaintiff's alleged educational-related injuries, the Court does not find Plaintiff has met his evidentiary burden of establishing a substantial threat of experiencing such injuries. Plaintiff did not raise this injury in the Motion or reply to the Motion. This issue was first introduced during the Hearing, at which time Plaintiff did not offer evidence concerning his enrollment in a doctoral program, the nature of his coursework, the topics of the papers he is

15

allegedly writing, and how he relies on his Facebook account and other platforms to write such papers. *See* Dkt. 24. Without adequate notice to the Court, adequate notice to Facebook, adequate briefing as to the law on such an injury, and evidence, the Court does not find Plaintiff has met his burden for preliminary injunctive relief.

Moreover, it appears the law finds "delayed education" an injury compensable through monetary damages. *See Doe v. Princeton Univ.*, No. 3:20-cv-4352-BRM-TJB, 2020 WL 2097991, at *7 (D.N.J. May 1, 2020) (holding, were plaintiff to prevail on merits and be reinstated as a student, plaintiff will have suffered a delay in education remediable through monetary damages); *Madej v. Yale Univ.*, No. 3:20-cv-133 (JCH), 2020 WL 1614230, at *6–7 (D. Conn. Mar. 31, 2020) (holding academic withdrawal means plaintiff's degree conferral will be delayed, which is remedied through monetary compensation); *Doe v. Vassar Coll.*, No. 19-cv-9601 (NSR), 2019 WL 6222918, at *6 (S.D.N.Y. Nov. 21, 2019) (no irreparable harm where plaintiff lost ability to graduate with his class year); *see also Hodges v. Board of Supervisors of La. St. Univ. & Agric. & Mech. Coll.*, No. 20-1456, 2020 WL 5017665, at *4 (E.D. La. Aug. 25, 2020) (compiling cases). In light of the cases cited herein and the present record before the Court, Plaintiff has not adequately shown his educational-related injuries constitute an irreparable harm.

### 3. Ability to Moderate Facebook Pages and Groups

With respect to Plaintiff's inability to moderate his Facebook Pages and Groups, the Court arrives at the same finding. Plaintiff did not describe this injury in the Motion (Dkt. 6) or reply to the Motion (Dkt. 14), raising it for the first time at the Hearing. *See* Dkt. 24. After reviewing the record, the Court only locates one piece of evidence to support the existence of this injury: a screenshot of a public Facebook Page. *See* Dkt. 10-14.

Plaintiff has failed to show how the deactivation of his account constitutes irreparable injury. If Plaintiff took this matter to trial and prevailed on the merits, Plaintiff could regain access to his accounts. From there, Plaintiff could either petition Facebook's staff to reactivate his Pages and Groups, or Plaintiff could start new Pages and Groups. Therefore, it appears Plaintiff's injury is reparable: Plaintiff's victory would entitle him to restore his Pages and Groups through Facebook's own processes, thereby making him whole again. Plaintiff has not explained why this route is inadequate. He has not met his burden to establish a substantial likelihood of suffering irreparable harm in this regard.

Overall, Plaintiff has failed to satisfy the burden for granting a TRO and/or preliminary injunction based upon the facts of this case and the present record before the Court.

### IV. CONCLUSION

For the foregoing reasons, the Court finds that Plaintiff's Motion (Dkt. 6) is hereby **DENIED**.

**So ORDERED and SIGNED this 22nd day of January, 2021.**

KIMBERLY C. PRIEST JOHNSON
UNITED STATES MAGISTRATE JUDGE