```
 1                IN THE UNITED STATES DISTRICT COURT
                  FOR THE EASTERN DISTRICT OF TEXAS
 2                          SHERMAN DIVISION

 3
      MICHAEL MOATES                    )
 4                                            DOCKET NO. 4:20cv896
          -vs-                         )
 5                                            Plano, Texas
                                       )      2:03 p.m. - 3:03 p.m.
 6    FACEBOOK INC., ET AL                    January 13, 2021

 7

 8             TRANSCRIPT HEARING ON EMERGENCY MOTION FOR
                       TEMPORARY RESTRAINING ORDER
 9                         BY VIDEO RECORDING
            BEFORE THE HONORABLE KIMBERLY C. PRIEST JOHNSON,
10                   UNITED STATES MAGISTRATE JUDGE

11

12                     APPEARANCES BY VIDEO

13

14    FOR THE PLAINTIFF:

15
      MR. MICHAEL MOATES
16    PRO SE
      2700 Colorado Blvd. No. 1526
17    Denton, TX 76201

18
      FOR THE DEFENDANTS:
19

20    MR. E. GLENN THAMES, JR.
      POTTER MINTON
21    110 North College, Ste. 500
      Tyler, Texas  75702
22

23    MR. W. HAMILTON JORDAN
      MR. CHRISTOPHER C. KEARNEY
24    KEKER & VAN NEST LLP
      633 Battery St.
25    San Francisco, CA 94111
```

```
 1 | VIDEO RECORDER
   | OPERATOR:       MS. JANE W. AMERSON
 2 |                 COURTROOM DEPUTY
   |                 7940 Preston Rd., Ste. 110
 3 |                 Plano, Texas 75024
   |
 4 |
   |
 5 |
   |
 6 | TRANSCRIBER:    MS. SHEA SLOAN
   |                 FEDERAL OFFICIAL COURT REPORTER
 7 |                 211 W. Ferguson
   |                 Tyler, Texas 75702
 8 |                 shea_sloan@txed.uscourts.gov
   |
 9 |
   |
10 |
   |
11 | Proceedings taken by Video Recording; transcript was produced
   | by a Transcriber.
12 |
   |
13 |
   |
14 |
   |
15 |
   |
16 |
   |
17 |
   |
18 |
   |
19 |
   |
20 |
   |
21 |
   |
22 |
   |
23 |
   |
24 |
   |
25 |
```

1          P R O C E E D I N G S

2          THE COURT:  State your appearances for the record,

3   please.

4          MR. THAMES:  Your Honor, Glenn Thames for Facebook,

5   and I am joined by Chris Kearney, and Hamilton Jordan, who I

6   should let introduce themselves so you can tell which one is

7   which, I suppose.

8          MR. JORDAN:  Good afternoon, Your Honor.  My name

9   is Hamilton Jordan, and I am here for Facebook on behalf of

10  the firm Keker, Van Ness & Peters.

11         MR. KEARNEY:  Good afternoon, Your Honor.  I'm

12  Christopher Kearney also with Keker, Van Ness & Peters on

13  behalf of Facebook.

14         THE COURT:  Good afternoon to you all.

15         MR. MOATES:  And this is Michael Moates.  I'm here

16  appearing pro se for myself.

17         THE COURT:  All right.  Good afternoon to you.

18         MR. MOATES:  How are you?

19         THE COURT:  Good.  Thank you.

20         All right.  We are proceeding by video conference

21  here today.  Sometimes there is a little bit of a delay

22  between my asking questions and you talking.  So I will try

23  not to talk on you -- over you.  It is a little bit difficult

24  with the lag time by video.

25         We are here today to hear argument on Mr. Moates's

1   emergency motion for a temporary restraining order.

2          Before we begin with argument, Mr. Moates, I want

3   to address a couple of things with you.  I know you initially

4   filed this lawsuit proceeding pro se on behalf of yourself,

5   as well as DC Chronicle as a nonprofit charity organization.

6          When the Court notified you in an order that if you

7   wanted to proceed with this lawsuit on behalf of DC

8   Chronicle, that that entity needed to be represented by

9   counsel, you filed a second amended complaint that only notes

10  yourself as a Plaintiff.  So I am assuming, but can you

11  confirm, that the requested TRO applies only to yourself?

12         MR. MOATES:  Yes, ma'am.  The circumstances are a

13  little bit different on some of the things that were in the

14  initial TRO.  But, yes, there are some parts of that that are

15  no longer applicable.

16         THE COURT:  Okay.  Well, that will be something

17  that you can note for me in your oral argument.

18         The other question that I have for you is whether

19  this hearing today is for purposes of the requested temporary

20  restraining order only or also for the preliminary

21  injunction.

22         MR. MOATES:  So, for both.

23         THE COURT:  Okay.  So you intend to present all of

24  your evidence here today, which means it would be appropriate

25  for the Court to go ahead and consider the issue of the

1   preliminary injunction, correct?

2            MR. MOATES:  Yes, ma'am -- yes, Judge.

3            THE COURT:  All right.  I am assuming, Mr. Moates,

4   that you are familiar with, as they were set forth in the

5   Defendants' response, the four elements required for you to

6   prove -- it is your burden to prove the four elements in

7   order to be entitled to a preliminary injunction, which means

8   action that the Court would take prior to the normal course

9   of action in this lawsuit.

10            I think from reading the briefing in this case it

11   appears to me that you are seeking the TRO and preliminary

12   injunction as a result of one claim, although you allege more

13   than this one particular claim in your second amended

14   complaint, and that is violations of the Sherman Act.  Is

15   that correct?

16            MR. MOTES:  Yes.  I -- I plan to -- and I notified

17   the Court yesterday and then also the counselors for the

18   Defendants, that I also intend to introduce additional

19   evidence.

20            Those, like I said a minute ago, those

21   circumstances a little bit changed whenever DC Chronicle was

22   dropped from the lawsuit.  And I notified your clerk and the

23   counsel that it was my intention to introduce anything that

24   was in the second amended complaint, the evidence, and

25   potentially claims that are in those as well.

1          THE COURT:   Okay.   I am going to ask you two more

2   specific questions, and then I will allow you to go forward

3   and address the Court as you wish --

4          MR. MOATES:   Okay.

5          THE COURT:   -- particularly addressing the four

6   elements for an injunction.

7          My first question is, what exactly -- what type of

8   injunctive relief -- what is the injunctive relief that you

9   are seeking?

10          MR. MOATES:   So the primary request would be --

11   and, again, this kind of goes back to their response to me --

12   was to have an order requiring them to reactivate those

13   accounts.

14          Now, on the face of it, the -- absent that,

15   providing me the data and then another injunction -- or, I'm

16   sorry, another order basically pointing that due to the fact

17   that I am a shareholder, information needs to be provided to

18   me that would not otherwise be available to me.

19          THE COURT:   And what is the basis for emergency

20   action on those two requests?

21          MR. MOATES:   So the irreparable harm piece of

22   that is -- so in their response they stated that their

23   concern was that it was just a monetary value.   And that is

24   not the case here.   As a shareholder, I have information that

25   needs to be made available to me that I cannot access at this

1  point.  And it directly affects the day-to-day operation of
2  those shares and trading.
3          For example, when I say that, what I am talking
4  about is the information that they release as part of
5  regulation FD, and fair disclosure is done on an internal
6  system inside of Facebook that if you do not have access to
7  it, you cannot see that information.  Without that
8  information, there is irreparable harm.  There is no way for
9  me to access that information.
10          THE COURT:  But what is the irreparable harm?
11          MR. MOATES:  The damages to the shareholding.  I
12  mean, I can give you an example.  This last week Facebook
13  banned President Donald Trump from the platform.  It was
14  announced on Mr. Zuckerberg's Facebook profile.  And that was
15  a $38 million loss for Facebook shareholders.
16          That information was made available on his page,
17  which you cannot access unless you have access to Facebook.
18  So, absent the access to his -- to being able to get onto
19  Facebook, you don't have those disclosures that are required
20  by the law.
21          THE COURT:  But isn't that a monetary loss?
22          MR. MOATES:  Not necessarily, because between the
23  day-to-day operations, it not only affects the monetary loss,
24  you are talking about -- what is the word I am looking for?
25  It is not just about value.  It is about having the

1   information, being able to decide not only if you want to

2   keep those shares, but also, you know, when you are talking

3   about things like potentially being able to vote, being able

4   to share information with other individuals, it is not -- I

5   don't think that it is just a monetary issue.

6           Those shares -- even if they paid the difference

7   down the road, those shares would still have a different

8   value regardless of the money that was paid to make up for

9   the loss.

10          THE COURT:  But isn't it true -- because right now

11  the only thing the Court's focused is on -- it is not the

12  merits of your claims, it's whether you are entitled to

13  emergency action, rather than action that you may be entitled

14  to at the end of this lawsuit --

15          MR. MOATES:  Right.  Right.

16          THE COURT:  -- so it is the only issue before the

17  Court right now.  So that is why I keep coming back to it is

18  your burden to articulate any damages that are irreparable,

19  and I will just say, in different terms that are not monetary

20  and that you do allege as irreparable harm if the injunction

21  is not granted.  And that is -- I don't see that in the

22  motion that you have filed.

23          MR. MOATES:  So outside of -- if we step a little

24  bit outside of what I am talking about with the regulation

25  FD, there are a couple of other pieces that I can share with

1  you that are -- I would argue are irreparable.

2       First of all -- and I did send counselors this

3  information asking for assistance with this -- in their

4  response to me, they said they would preserve the data for

5  Facebook and Instagram.  But they failed to say they would

6  preserve the WhatsApp data, the CrowdTangle, Messenger data,

7  and Oculus data.  All of that data is part of this case.

8       And so in that attestation they didn't say they

9  were going to preserve those.  I did reach out to counselors

10  and ask if we could amend that and if they would be willing

11  to put that in writing, and I did not hear back.

12       THE COURT:  Okay.  Let me stop you right there.

13       MR. MOATES:  Okay.

14       THE COURT:  The lawyers have a duty to preserve

15  information related to a lawsuit upon notice or even in

16  anticipation of a lawsuit.

17       So I am going to assume that the Defense Lawyers

18  that are present today have preserved all of that

19  information.

20       And does someone want to the confirm that now?

21       MR. JORDAN:  Your Honor, Hamilton Jordan on behalf

22  of Facebook.  Yes, I can confirm that Facebook has undertaken

23  and is continuing to undertake reasonable efforts as required

24  under its duties as a civil litigant -- as any civil litigant

25  would before this Court to identify and preserve relevant

1    information, including information -- including all of the
2    relevant information bearing on the known accounts of
3    Mr. Moates.
4              THE COURT:  All right.  Thank you.
5              Mr. Moates --
6              MR. MOATES:  Your Honor, I have concerns about that
7    statement because I was emailing with Mr. Jordan last week,
8    and he was asking for information regarding a WhatsApp
9    account that I do not have access to.  And they have said
10   that they are not sure they can investigate and preserve the
11   data of the account absent the information.
12             So I am a little bit concerned by that statement
13   because it seems as though they don't know all of the
14   accounts, and that's part of the problem here.
15             THE COURT:  Well, why don't we do this, because it
16   is one of the things that I was going to ask you anyways
17   because you generally reference your accounts.  I know
18   initially there were some accounts that were related to DC
19   Chronicle, and so I was going to ask you anyway, so I will
20   ask you now, what are the accounts that are at issue,
21   particularly in your request for injunctive relief?
22             MR. MOATES:  So there is the Facebook account in my
23   name.  It is Michael Moates.  And that includes all of the
24   pages, profiles, and groups -- I'm sorry, profile and groups
25   attached to it.

1           There is the Messenger account, the Facebook

2   Messenger account, which is integrated with Facebook but also

3   operates as a separate website, and --

4           THE COURT:  And that is under your name as well?

5           MR. MOATES:  Do what now?

6           THE COURT:  And that is under your name as well?

7           MR. MOATES:  Yes, ma'am.

8           THE COURT:  Okay.

9           MR. MOATES:  There is a CrowdTangle account which

10   is connected to my Facebook account.  But it is a third-party

11   website.  I it under my name as well.

12           THE COURT:  Okay.

13           MR. MOATES:  There is the Oculus account, which is

14   separate, completely separate from Facebook.  And it is also

15   under my name.

16           And then, finally, the WhatsApp account, which is

17   under a phone number that I do not have access to.  And it

18   was stored in my Facebook account.  In order to get that

19   phone number for the counsels, I would need access to that

20   data, which I don't have.  And I notified Mr. Jordan of that

21   last week.

22           THE COURT:  Okay.  All right.  I am not going to

23   interrupt you.  I am going to let you talk to me for a little

24   bit, Mr. Moates, specifically regarding the first two

25   elements is what I am really focused on, the likelihood of

1   success on the merits with regard to your Sherman Act claim,

2   as well as specifically what the substantial threat of

3   irreparable harm would be if the injunction is not granted.

4              MR. MOATES:  Yes, ma'am.

5              So with regards to the first element of success on

6   the merits, I think that the case is pretty -- pretty strong

7   in the sense that when you talk about -- there are certain

8   aspects of it that I think that are going to be open to

9   interpretation.  For example, the challenge of the

10  Communications Decency Act, I expect that, you know, to be

11  fought and argued, whatever.

12             But what I don't expect is -- or it very well may

13  be challenged, and my understanding is they are going to

14  request a transfer of the Court to the Northern District of

15  California.  What I don't expect to be an issue is the things

16  that are specifically in the contract, for example, your page

17  your profile, those aspects of the -- you know, the

18  statements being made that are definitives.

19             For example, Facebook committing to provide me the

20  data, which is in writing.  It is in the evidence submitted

21  in the second amended complaint where they said, here is how

22  you get your data, here is how you do X, Y, Z.  In their

23  terms of service where it says, we will provide you with your

24  data upon request.

25             These aspects are part of a very specific argument

1  that they have committed to do.

2         Now, with regards to the second piece of that, the

3  irreparable harm, there --

4         THE COURT:  Wait --

5         MR. MOATES:  -- there are a lot of different --

6         THE COURT:  -- before you move on.  There are three

7  elements to your specific claim, that Defendants engaged in a

8  conspiracy that produced some anticompetitive effect in the

9  relevant market.  So that is what I need -- that's what you

10 have got to show that you have -- that you are substantially

11 likely to win on that claim as to those three elements.

12        MR. MOATES:  Yes, ma'am.

13        THE COURT:  And in what you just told me, I didn't

14 hear anything addressed with regards to any of those three

15 elements.

16        MR. MOATES:  Yes, ma'am.  So -- I'm sorry -- I had

17 a moment.  So to answer your -- or to respond to what you

18 just said, as far as the market goes, so the case here -- and

19 I submitted multiple complaints as a part of the evidence

20 from the government, but the issue at hand here with regards

21 to the Sherman Act is how there is a conspiracy, like you

22 stated.

23        And what that is, is they are grouping together

24 these different companies, which -- in an illegal way where

25 WhatsApp, Instagram, CrowdTangle, Messenger, all these

1   companies that were bought or -- you know, by Facebook.

2          For example, when Instagram was acquired, they said
3   they needed to buy -- or Mark Zuckerberg -- and I put this in
4   my -- I believe it was the brief -- that they needed to buy
5   it because it was the competition, and they were concerned by
6   that.

7          Now, with that as -- and piece of it then there is
8   the action that they use that that -- those acquisitions to
9   basically target people.

10          I mean, for example, for me, for example, they
11  didn't just claim that I violated one rule on one platform.
12  They then turned around and used that power they grabbed, to
13  ban me across all platforms.  Then they targeted the
14  competition -- and like, for example, like I said, this last
15  week where they attempted to get other platforms -- I would
16  need to look -- I'm sorry.

17          Basically, they had -- there's an issue of other
18  platforms being able to successfully run.  And as a part of
19  that, for me, you know, there is the concern that I -- I am
20  concerned that that information with regards to the different
21  pieces or aspects is something that will not allow, I guess
22  for competition is -- for lack of a better word.

23          I think that when you try to acquire businesses so
24  that you don't have competition, that is taking away from the
25  competition, which is exactly why the Sherman Act was

1   enacted.

2           THE COURT:  Uh-huh.  So what I hear you say is a

3   lot of "I thinks" and "I feel."  And so I think I understand

4   generally your theory, but what evidence do you have to

5   support those statements?

6           MR. MOATES:  So I submitted the government's

7   complaints, and then also I sent -- I'm sorry, I'm pulling

8   this -- I planned to use the government's complaints and the

9   facts from the government to defend against the Sherman Act

10  and the Clayton Act claims, which are in the evidence in my

11  second amended complaint.

12          THE COURT:  Okay.  So --

13          MR. MOATES:  And there was evidence attached to

14  those as well.

15          THE COURT:  All right.  So this is your chance to

16  do that here today, not necessarily for your entire lawsuit,

17  but to support your request for injunctive relief.

18          So is there any specific evidence that you would

19  like to point the Court to, or do you just want to generally

20  reference that attached to your second amended complaint?

21          MR. MOATES:  I would like to, Judge, generally

22  reference that.  The biggest piece of information that I

23  would like to point out is the statement that is in the

24  complaint by the FTC, that Mark Zuckerberg had stated that

25  they needed to get -- they needed to end the competition.

1    And that is in the -- I'm sorry.  Just one second.  I am

2    looking.  It is in Exhibit S, FTC v. Facebook.

3              THE COURT:  Okay.  All right.  Now, as to

4    irreparable injury, as to that particular claim, what's the

5    irreparable injury?

6              MR. MOATES:  So a couple of important aspects.  So,

7    as I stated, based on the acquisition of these companies, all

8    of them collectively, when they banned me across them after

9    those -- you know, like they did those acquisitions and they

10   banned people across them, for me it is there is multiple

11   issues here.

12             It is business data that I can no longer access

13   that is extremely important and relevant, for example,

14   analytical data that is on those pages that plays into the

15   day-to-day self -- my own self-interests and business

16   operations as a sole proprietor --

17             THE COURT:  Okay.  Wait.  Don't move on yet.  So

18   what business data specifically is on the accounts that you

19   referenced earlier that you don't otherwise have access to?

20             MR. MOATES:  So there is the analytical data on

21   those pages and groups, which includes numbers of active

22   users of engagements.  There are names, addresses, and phone

23   numbers.  There are private messages between me and other

24   businesses and contractors and associates.

25             THE COURT:  And do you conduct a particular

1  business using these accounts?

2     MR. MOATES:  I conduct multiple businesses using

3  these accounts, Judge.  I -- separate from that of DC

4  Chronicle, I do independently -- I do as an independent

5  contractor, I do different things for different

6  organizations.

7     For example, I was a writer for the Washington

8  Examiner.  I conduct my own private Facebook page, which I

9  use for my own personal business.

10     THE COURT:  And what is your personal business?

11     MR. MOATES:  I do side journalism outside of

12  DC Chronicle, and I also do a nonprofit charity foundation.

13  I do -- I do donations and stuff of that nature to other

14  organizations, not myself.  I am not running an organization.

15  I am saying I use it for that purpose to -- I have done

16  fundraising.  I have done donations and stuff like that, as

17  well.

18     Also, talk about, you know, outside business as

19  well, school.  I use it for school.  I have information that

20  is relevant to my doctoral course work.  I'm a doctor of

21  education student.  All of that information that is stored in

22  those messages is extremely relevant and important to me on

23  being successful and passing my classes because I can't

24  access that information at this moment.

25     THE COURT:  And you are talking about the

1  analytical data that you are using for, I guess a thesis

2  statement or something like that?

3        MR. MOATES:  For -- yes, for multiple papers and

4  for course work.  So there is the analytical data.  There is

5  the -- and it is not just the analytical data.  There is the

6  messages just between other individuals, people like I have

7  worked with that I need access to; you know, things of those

8  natures.

9        To be completely blunt, when the counselors

10  introduced in their response to me that, you know, we needed

11  to preserve the status quo, my argument to that was -- is

12  they didn't disable all of my accounts.

13        So with those accounts still being active, I am

14  responsible for things that I cannot control.  And what I

15  mean by that, for example, is Facebook has left those groups

16  that I moderate and I admin. as being active even though my

17  account is disabled.

18        So those -- so people that are posting into those

19  groups can post things, and Facebook can turn around and

20  say -- if they don't like it, they will say they will take

21  this group down because of the content that is in this group,

22  or we are going to limit the access because we don't like the

23  content in this group.  And I am the sole person responsible

24  for those groups, but I don't have access to them.  So,

25  basically, I can be punished for something that I don't have

1   control over, if that makes sense.

2        THE COURT:  Well, you are not necessarily being

3   punished, but you are arguing I think that other people are

4   being punished by visiting a website that -- or an account

5   that still shows as active but that you no longer can

6   access.

7        MR. MOATES:  Well, what I am saying is that at the

8   end of this case if you -- if I was to get access back to my

9   Facebook account, those groups could be in jeopardy when they

10  are not at this moment.  Those groups right now are in good

11  standing.

12       But let's say, for example, if someone posts in

13  those groups something that they shouldn't, you know,

14  something -- I can't even think.  Let's say it goes against

15  their fake news policy or it goes against one of their

16  violence policies, I am not there to police that to remove

17  it.  But Facebook penalizes the group itself.  So my group,

18  in theory, could be penalized for not being moderated even

19  though I don't have the access to moderate it.  Does that

20  make sense?

21       THE COURT:  Yes.

22       MR. MOATES:  Okay.

23       THE COURT:  Okay.  Any other argument that you want

24  to present with regards to irreparable harm?

25       MR. MOATES:  So there are a couple of quick things.

1    I -- irreparable harm.  And this is a little bit on -- like I
2    said, do you want me to just touch on the Sherman Act, or do
3    you want to go ahead and expand a little bit?  There were a
4    couple of things I intended to add.

5          THE COURT:  Well, I think for the purposes of
6    today's hearing unless I am incorrect in interpreting your
7    motion, it appears that your request for injunctive relief is
8    based only on the Sherman Act claim.

9          MR. MOATES:  That is correct.  There were some
10   actions that were taken after the initial complaint was
11   filed.  For example, I have been charged -- or attempted to
12   be charged by Facebook.  So, essentially, I am going -- and,
13   again, this is -- I am informing the Court, it is my
14   intention to file a complaint with the Consumer Financial
15   Protection Bureau because Facebook is continuing automatic
16   debts against my debit card for advertising after I have
17   revoked their authorizations.

18         So that is -- again, these are things -- they are
19   little things -- but they attempted to charge me one, two,
20   three, four, five, six, seven, eight, nine, 10, 11, 12, 13 --
21   14 times since they have disabled my account, for over $200.

22         THE COURT:  So that is monetary relief, you will
23   acknowledge, correct?

24         MR. MOATES:  It is monetary, but it also is -- it
25   is not just monetary.  It also goes against my account.

1    Well, when the bank denies it, they -- it is like a strike on

2    my account because they are trying to charge me.

3          Now, I have notified the bank to issue a stop

4    payment against those charges, but it is still a strike.  And

5    I did notify, I believe it was Mr. Kearney or Mr. Hamilton,

6    that -- and also one of their other colleagues, is it -- I

7    believe his name is Paven, that it was -- that that was my

8    intention, and I sent them a formal letter, that the issue

9    with that is, is not as much about the monetary issue as much

10   as it is that my bank considers those transactions against my

11   account.  So it is a reputation score.

12          THE COURT:  All right.  Anything else?

13          MR. MOATES:  And then the last thing, as I stated

14   earlier, the regulation fair disclosure, the FD, is an issue.

15   So, as I stated, I am a shareholder.  There has been a $34

16   billion loss since some of the -- being as they don't have

17   access to those informations which are on -- inside the

18   internal systems of Facebook, and that is part of the issue

19   now.  I don't think that is all monetary.

20          And then one last thing, and I put this in my

21   evidence, it is redacted, and I am happy to provide the Court

22   and the counselors with an original copy.  I would like to do

23   so under seal, if I need to.

24          There is a lot of records information that is

25   stored that they have on Facebook, Instagram, et cetera, that

1  is currently the subject of a Grand Jury subpoena.  The

2  government is investigating people that I was associated

3  with, and so I provided some of that information to the

4  government, continued to follow up with me and asked for more

5  information.

6          Also, it would go to my defense if for some reason

7  I was ever charged and I don't have access to that

8  information.  So that is -- that is a huge piece in itself.

9  That data is -- that is irreparable harm.  I mean, for me to

10  not be able to provide that information to my own defense or

11  to the government is a real problem.

12          That's all for now.

13          THE COURT:  Okay.  And when did that happen?

14          MR. MOATES:  The initial -- the initial Grand Jury

15  subpoena was in August.  Before my account was disabled, I

16  was working with the government, and I am still working with

17  the government.

18          THE COURT:  So are you working in tandem with the

19  government, or is the government investigating people that

20  you are associated with --

21          MR. MOATES:  I am a witness.

22          THE COURT:  You are a witness?

23          MR. MOATES:  I am a witness for the government,

24  that's correct.

25          They are investigating people that I was associated

1    with.  Some people I was not associated with.  But some

2    people I was associated.  And that information I'm just

3    providing to them as we go along.  I spoke with them less

4    than a week ago.

5             THE COURT:  You know that the government can access

6    information in Facebook accounts by other means other than

7    just the user itself, correct?

8             MR. MOATES:  Yes, ma'am.  But that does not give me

9    the opportunity to give my counsel or my attorneys the

10   information that I need in order to make sure that I am

11   protected.

12            I would like to be able to make sure that any

13   information that the government has that I also make

14   available to my counsel so I can potentially defend myself.

15   I want to make sure that my bases are covered as well.  And

16   it concerns me that, you know, even after -- and I introduced

17   this into evidence -- even after Facebook telling me they

18   would provide me that data, they have not.

19            THE COURT:  And I guess that is what I was asking

20   you about earlier when I was asking if you were a witness or

21   if you were actually a subject or a target of an

22   investigation because I thought I heard you mention something

23   about a defense.

24            MR. MOATES:  I am concerned, I am concerned,

25   Your Honor.  I am a witness as of right now.  But, you know,

1   just based on talking with my attorney, these things can

2   spiral downhill.

3           THE COURT:  So are you represented?  Do you have a

4   criminal defense attorney at this time?

5           MR. MOATES:  I am consulting with an attorney.  I

6   have not retained one as of yet.

7           THE COURT:  Okay.  I will hear a response from the

8   Defendants at this time.

9           And then, Mr. Moates, I will give you an

10  opportunity to address anything from the response after.

11          I am not sure who is arguing for the Defendants.

12          MR. JORDAN:  Good afternoon, Your Honor, I,

13  Hamilton Jordan, I will be arguing on behalf of the

14  Defendants today.

15          Can everyone hear me okay?  Okay.  Fantastic.

16          Your Honor, our December 11th written response to

17  Mr. Moates's application lays out our positions on the four

18  factors in fair detail.  I think that -- and I defer to

19  Your Honor, but I am inclined to begin by responding to some

20  points raised in Mr. Moates's opening argument, and then I

21  would be happy to answer any specific questions Your Honor

22  may have.

23          THE COURT:  I don't have any specific questions for

24  you, Counsel.  As I told Mr. Moates, I am focused on those

25  first two factors, as that is where I see the probably most

1    glaring issues with respect to injunctive relief.  So you may
2    proceed as you wish.

3              MR. JORDAN:   Thank you, Your Honor.

4              So on those -- on those two factors, I mean, just
5    starting with irreparable harm, I don't believe that we have
6    heard anything today or seen anything in Mr. Moates's papers
7    that clearly establishes, which is his burden, a substantial
8    threat of injury if he is not -- if he must wait until the
9    end of this lawsuit to win the relief that he seeks.

10             And just a couple of specific points on that,
11   Your Honor.  I would like to raise first this shareholder
12   rights issue that Mr. Moates has addressed a couple of times
13   today.

14             It is our position, Your Honor, that that -- that
15   that issue definitely was not part of his TRO application.  I
16   believe it was not raised at all until the second amended
17   complaint.  And Mr. Moates has conceded, including on the
18   record today, that he is only seeking injunctive and
19   preliminary relief on the basis of the Sherman Act claim.

20             So to the extent that he is alleging some sort of
21   shareholder rights access issue, we believe that that issue
22   is not ripe.

23             But even if it were ripe, Your Honor, Mr. Moates
24   has not clearly established any irreparable harm that would
25   flow from his inability to access any information to which he

1  alleges he is entitled.

2          Even in the exhibits that he attaches rather --

3  last night, Your Honor, shortly after midnight we received an

4  email with some additional information, additional exhibits

5  from Mr. Moates.

6          And in one of those exhibits, which is exhibit -- I

7  believe it is Exhibit E, that -- in the text that he even

8  highlights, it says that Facebook provides certain

9  shareholder information, not just through Mr. Zuckerberg's

10 Facebook page but through other -- through other Facebook

11 websites that do not appear to require, based on my initial

12 review, any sort of Facebook account to access.

13         But our primary point here, Your Honor, is we think

14 the shareholder rights issue is not ripe, and secondarily to

15 that that it does not raise any irreparable harm issues.

16         If Mr. Moates through the course of this litigation

17 is able to establish any injury along those lines, that

18 injury could be remedied at the end of this lawsuit, likely

19 with monetary compensation.

20         I also would like to respond to a couple of other

21 specific points that Mr. Moates raises.  He -- on the -- on

22 sort of the -- oh, for one, Your Honor, he alleges that

23 Facebook has -- rather, he expresses concerns with the status

24 of his WhatsApp, CrowdTangle, and Oculus accounts.  And I

25 would just like to assure the Court that Facebook is

1    undertaking reasonable efforts to identify and preserve all

2    relevant information related to all of Mr. Moates's accounts.

3         As to WhatsApp in particular, yes, we have been in

4    communication with Mr. Moates about this issue.  To date, we

5    are continuing to investigate it, but we have not been able

6    to identify any WhatsApp associated with Mr. Moates.  We have

7    reached out to him and asked if he could provide the

8    telephone number that he used to sign up.

9         I understand from Mr. Moates that he does not

10   recall that telephone number.  We are going to continue to

11   investigate this issue to see if we can get to the bottom of

12   it, but all of these efforts, Your Honor, are being

13   undertaken in good faith, as is Facebook's duty, to preserve

14   and identify all relevant information.

15        And a restraining order is certainly not warranted

16   or appropriate to ensure that Facebook is undertaking the

17   duties that it is already undertaking, as it is required to

18   do as a civil litigant.

19        On the issue of the merits of his antitrust claim,

20   Mr. Moates briefly discussed certain communications with

21   Facebook, as well as certain terms in Facebook's terms of

22   service.

23        Your Honor, his communications with Facebook and

24   the terms and conditions of the contract he entered into with

25   Facebook, those are not relevant to any sort of antitrust

1    theory, Your Honor.  And, frankly, we are not seeing this --
2    it really appears, Your Honor, that this is a private dispute
3    between Facebook and Mr. Moates over his access to his
4    accounts.

5         He is trying to turn this into something much
6    bigger that challenges Facebook's entire existence.  And we
7    think that this is really -- the types of harms he is
8    alleging in his complaint and that he has referenced in the
9    temporary restraining order application are not the sort of
10   harms that the Sherman Act was implemented to protect and to
11   guard against.

12        And to Your Honor's point, to the extent that
13   Mr. Moates is voicing concerns regarding Facebook's alleged
14   targeting of competition, those are just concerns.  You asked
15   Mr. Moates what his best evidence is, and he referenced,
16   frankly, not evidence, Your Honor, but just a complaint from
17   another lawsuit.  A pleading is not evidence, much less a
18   pleading from another case.

19        And Mr. Moates specifically referenced a statement
20   referenced in one of those complaints in which Mr. Zuckerberg
21   allegedly made some comments about Facebook's competition.

22        Well, Mr. Moates today has not established that he
23   is a competitor of Facebook, nor has he established that he
24   has standing to vindicate the rights of Facebook's
25   competitors in an antitrust action.

1          As for his claim that his business data that -- his

2    inability to access business data raises the risk of

3    irreparable harm, Your Honor, we -- you know, I would say

4    again that Mr. Moates has not established clearly, as he

5    must, that his ability to access this data could not be --

6    or, rather, his inability to access the data could not be

7    compensated at some later date with monetary relief.

8          And there is not evidence on the record to

9    establish that.  And to grant a preliminary injunction or a

10   temporary restraining order, Mr. Moates must come in with

11   evidence, and he must clearly establish on all four factors

12   his entitlement to relief.  And we believe it is clear from

13   the record that he has not done that today.

14          THE COURT:  So if you can educate me briefly on the

15   typical protocols of Facebook when it suspends or deactivates

16   an account.  I understand that it preserves that information,

17   but am I correct in understanding that it will not provide a

18   copy of that information to the account holder?

19          MR. JORDAN:  Your Honor, we are still -- I just

20   want to be clear about the extent of the representations that

21   I can make on the record about this today to Your Honor.  We

22   are continuing to investigate this issue, but Facebook's

23   current position, which is -- is that the reason for

24   Mr. Moates's account disabling -- and he acknowledges this,

25   by the way, in his second amended complaint -- he concedes

1    that he operated a page with a title relating to QAnon.

2            It is public information that was in the last

3    several months that Facebook has implemented a policy through

4    which it has been identifying and removing accounts and pages

5    related to the QAnon movement.

6            And so, Your Honor, currently on the basis of the

7    reasons for Mr. Moates's account disabling, it is unclear

8    that -- or rather -- I will rephrase that, Your Honor.

9            Currently, Your Honor, we are not in a position to

10   be able to offer to Mr. Moates that -- any ability to return

11   his data, based on the reasons for the disabling of his

12   account.  But we are preserving the data for the duration of

13   this litigation, as is our obligation.

14           THE COURT:  Okay.  I am familiar generally with the

15   positions that Facebook has recently taken with regard to

16   QAnon and other similar groups.  And I guess that was my

17   question, although I am not -- I'm not sure it is entirely

18   relevant for the emergency issue today.  I am sure this is

19   not the first time it has come up.

20           And so I was just curious if there was any sort of

21   protocols in place at the moment with respect to all of the

22   accounts that fall under that umbrella and giving those

23   account holders access to their data.

24           MR. JORDAN:  Understood, Your Honor.  And I will

25   just say that because this is a relatively new issue, and a

1  new policy change, I am not in a position today to sort of

2  make a broad representation about how Facebook is approaching

3  those deactivated accounts as far as the data.

4          But I can say that for this case Facebook is

5  identifying and retaining the data -- the known data

6  associated with Mr. Moates.  And, certainly, for the purposes

7  of today's request for emergency relief, we agree with

8  Your Honor that it is not necessary to resolve that

9  particular issue about the extent of Facebook's data

10  retention policies to hold that Mr. Moates is not entitled to

11  emergency relief.

12          THE COURT:  All right.  Anything else you would

13  like to say in response to Mr. Moates's request for

14  injunctive relief?

15          MR. JORDAN:  Your Honor, I would -- I just would

16  like to make sure I touch on a couple of other points he

17  made.

18          Mr. Moates discussed an issue implying that the

19  alleged continuing charges against Mr. Moates's credit card

20  or bank account might risk some issue of good standing with

21  his bank.  Our position on that would be that, to the extent

22  there is any injury there, that also sounds like an injury

23  that surely could be compensated with monetary relief.

24          And, lastly, on this issue about this subpoena to

25  which, you know, and this notion that Mr. Moates is a witness

1    to a pending investigation, you know, to the extent that

2    Mr. Moates is concerned about his own criminal exposure and

3    the possibility of eventually being a defendant, as

4    Your Honor noted, the government has other means through

5    which it can access information, and to the extent that the

6    government eventually finds itself with information to which

7    Mr. Moates feels he is entitled if he were a defendant, of

8    course, the government would have a Brady obligation to turn

9    over any exculpatory information to him.

10            THE COURT:  Well, right, but what if it is not

11   Brady material?  If it is material that is not helpful to

12   him, they don't have an obligation to turn it over prior to

13   at least any type of trial.

14            And so it would seem to me that if -- and this is

15   not -- this is not of concern today because these are not the

16   facts, at least as they have been represented, but to the

17   extent that Mr. Moates does become the target of a criminal

18   investigation, you know, that could be a different issue in

19   terms of his ability to access information that could be

20   obtained in other ways by the government and/or used in a

21   criminal defense.  Again, not before us here today, but, you

22   know, that is a different issue.

23            MR. JORDAN:  Understood, Your Honor.  And for

24   present purposes, Mr. Moates has alleged that he is a

25   witness, and on the basis of the current record, there

1    is -- he has not clearly established there is any risk of

2    harm to him as a witness in the government's -- or rather in

3    his inability to currently access whatever specific

4    data -- or whatever particular data, the specifics of it are

5    currently unknown on the record, but he has not clearly

6    established that.

7              THE COURT:  All right.  Thank you very much.

8              Mr. Moates, as I told you earlier, I will give you

9    a chance to reply to any of the points that were just made.

10   What would you like to state at this time?

11             MR. MOATES:  Yes, ma'am.  So to clarify,

12   Counselor -- one of the first things that Counselor said that

13   I agreed that the only thing that I was bringing forth today

14   was in regards to the Sherman Act.  I don't agree with that

15   statement, and here is why.

16             When you asked me if that was the case, I told you,

17   I think, the circumstances had changed.

18             THE COURT:  But what -- but what his point was, and

19   he is accurate, in your motion that is pending before the

20   Court, which was set for this hearing today, which is the

21   emergency motion for temporary restraining order, it appears

22   from that filing that, at least at the time this filing was

23   made, the request was based only on the Sherman Act claim.

24   And so, even though you allege that circumstances have

25   transpired since then, that is not before the Court today.

1   And that is the point that he was making.

2           MR. MOATES:  I understand.  My statement is in

3   response to when you asked me earlier if that was the only

4   thing that I was alleging.  I wanted to clarify that.

5           Now, in retrospect with regards to the data and the

6   irreparable harm, when we are talking about -- if we go back

7   to the Sherman Act for a second, there is the -- he said that

8   I am not a competitor of Facebook, which I wholeheartedly

9   disagree with for multiple reasons.

10          I am a publisher.  Facebook is a publisher.  They

11  employ journalism organizations to write articles -- I say

12  employ, contract, however they want to define it.  They pay

13  people to write articles that they then promote in their own

14  field.  Those articles are competition from what I do.

15          In addition, I provide content.  Facebook also

16  provides content that competes with me, in their news feed.

17  That is competition.  We do compete.

18          Now, on the big business aspect of it, there are

19  different -- there are different business operations.  But to

20  say that we don't compete against each other, is not

21  accurate.  In fact, I would say that Facebook has an interest

22  in competing against publishers when they publish things to

23  get their articles seen higher than those of other

24  publishers.

25          THE COURT:  But you are a user of Facebook.  So how

1   can it be that you are a user of Facebook but now you are

2   alleging you are a competitor of Facebook?

3          MR. MOATES:  I am both, Your Honor, at least in my

4   view, because I publish information as a journalist so I have

5   the ability to -- when I -- like, for example -- I will make

6   it very simple -- Facebook employs fact-checkers.  Those

7   fact-checkers write articles that they then promote in news

8   feed when they disagree with someone else who has posted.

9          So, in theory, Facebook is employing journalists or

10  contracting with journalists that they then promote above

11  other publishers.  That is direct competition to my business.

12  I do journalism.  I write articles.  So Facebook is competing

13  with me.

14         They compete with me on Facebook, on Instagram, on

15  Oculus -- I'm sorry, not Oculus -- on CrowdTangle.  And all

16  of this data is relevant.

17         You know, the analytics, he said that there was no

18  irreparable harm.  There absolutely is irreparable harm in

19  competition.  When you start talking about things like having

20  access to business data, this is not monetary.  Those names

21  and addresses and phone numbers, the information that I have

22  as far as numbers, that's not a monetary thing that they can

23  simply pay back.  It is information that I need now.

24         We have a chain of events, you know, current events

25  that are going on.  For example, right now I cannot

1  communicate with those who have signed up for my newsletter

2  because Facebook has restricted my access. In two weeks

3  Donald Trump will no longer be President. It will not be

4  relevant. And they can't just pay that off. These are

5  things that I -- that current events will not be able to be

6  back-dated.

7         This information is relevant now. I need those

8  names, I need those numbers, and I need the information. And

9  Facebook has taken out a competitor, which I compete against

10  them, like I said with publishing, they have taken out a

11  competitor and basically made it so I can't access that

12  information.

13         And Facebook has conceded that you are -- and based

14  on his statements with regards to the terms of service, he

15  said they are not relevant. I think they are absolutely

16  relevant. When you enter into an agreement with someone,

17  those -- those terms are relevant. They say that you can

18  download your data at any time. That is in my second amended

19  complaint. It is in the exhibits.

20         They then further went on to say they were going to

21  provide me that data. They sent me URLs and links to get

22  that data. But those URLs were inactive. I mean, this is

23  clearly a competitive publishing issue here. And Facebook

24  may be a platform, but they are also a publisher.

25         And so that information is relevant to me and they

1   are competing against me and I need that information.  And I

2   think that that is important when you are talking about

3   competition.  They need to provide that information.  At the

4   bare minimum, they are competing against me, and they are not

5   holding up contractual agreements.

6           THE COURT:  Okay.  Anything else?

7           MR. MOATES:  I have a motion after we are done.

8           THE COURT:  What, that you intend to file?

9           MR. MOATES:  Yes, ma'am.  A request.

10          THE COURT:  Okay.

11          MR. MOATES:  Yes, ma'am.  I was going to ask -- I

12  know that it is uncommon, I have asthma and upper respiratory

13  problems, so I would like the Court to grant me leave to file

14  electronically.

15          I already have a Pacer account, but the court

16  denied me access to come into the building because -- based

17  on a doctor's recommendation, based on the State of Texas and

18  CDC guidelines, because of my asthma, I have been instructed

19  not to wear a mask.  So it puts me at risk to go out into

20  public to mail items to you guys and to also to come to the

21  court.  And the court wouldn't even let me in.  I would like

22  the ability to upload electronically if that is possible.

23          THE COURT:  I am not authorized to grant that

24  request.  Our pro se litigants cannot file electronically.  I

25  will visit with the Clerk about your particular issue.  You

1  definitely won't be allowed into the courthouse without a

2  mask.  That is our policy, and there is no leniency to

3  that --

4           MR. MOATES:  I understand.

5           THE COURT:  -- for the safety of all of the court

6  personnel.  But I will talk to our Clerk and see if there is

7  any discretion that I have, given your particular

8  circumstance.

9           MR. MOATES:  Thank you.  I appreciate it.

10           THE COURT:  Okay.

11           All right.  One last housekeeping matter before we

12  adjourn today.  I will issue an order as quickly as possible,

13  although I want it to be substantive enough to address some

14  of these issues.  And I will just sort of be forthright and

15  open, typically -- with the parties -- typically I would have

16  scheduled this hearing earlier.  There were some procedural

17  issues, given Mr. Moates proceeding pro se and initially

18  including another party that -- so we had to address those

19  issues.

20           But my entire family was exposed and came down with

21  COVID.  So the Court has been operating remotely and was a

22  little bit delayed due to that.  So we are -- we will be back

23  in the courthouse and working up to full speed.  So I will

24  get this out quickly.

25           The thing I need to address with you is a

1  procedural issue.  And I know Mr. Thames is familiar with
2  this issue that I am going to address because it is an issue
3  that frequently comes up, at least in our division, and in
4  our district I believe as a whole, and that is the issue of
5  cases that I am assigned to for pretrial only versus cases
6  that are referred to me for the entire case including the
7  trial.
8          For substantive motions for cases that I am only --
9  the case is only referred to me for pretrial, which is the
10 circumstance in this case, I believe, at this point, meaning
11 that unless all parties file a consent to proceed before me
12 for trial, that is how the case will remain, which is fine.
13         My orders for non-substantive issues will be final,
14 regardless.  For substantive issues in a referral case but
15 not for trial, my opinions on substantive issues will be in
16 the form of a report and recommendation, which means that
17 either party will have 14 days to file objections, and then
18 the entire issue will be considered by -- this is --
19 Judge Mazzant is the District Judge on this case currently.
20 And so that is for the entire case at large.
21         For purposes of injunctive relief, because I am
22 considering the issue of preliminary injunctive relief and
23 not just the issue of temporary restraining order, it makes
24 it a little bit easier because we don't have that only 14-day
25 window that you have got to consider.

1          But I do like to know from the parties on the

2   record, you do have the option, even if you don't want to

3   consent for the entire case -- that is not a question I will

4   ask you right now because you would file the required

5   paperwork to do that for the case to be transferred to me --

6   but for purposes of injunctive relief, you do have the option

7   to consent on the record for purposes of injunctive relief

8   only.

9          You don't have to do that.  If you don't want to do

10  that, then I will issue a report and recommendation.  Just

11  understand that there will be a delay period because we will

12  have to allow for the 14-day objection time period, as well

13  as for then the District Judge to consider this issue on the

14  papers.

15         Is that clear?  Like I said, I know Mr. Thames is

16  familiar with this issue.

17         Mr. Moates, do you understand what I am saying?

18         MR. MOATES:  Yes, ma'am, I do.

19         THE COURT:  Okay.  And so, like I said, I won't ask

20  you for the entire case at this point.  For the purposes of

21  injunctive relief, is it the parties' preference to consent

22  for the purposes of injunctive relief, or is it the parties'

23  preference to just proceed as we are and me issue my opinion

24  in the form of a report and recommendation?

25         MR. KEARNEY:  Your Honor --

1            MR. MOATES:  I -- I'm sorry.

2            MR. KEARNEY:  Go ahead.

3            MR. MOATES:  Go ahead.

4            MR. KEARNEY:  I was going to say, Your Honor, I

5    apologize that we hadn't considered this issue before the

6    hearing today.  We would just like briefly opportunity to

7    confer with our client, and we can get back to Your Honor

8    very quickly on that, if that was okay.

9            THE COURT:  No.  I absolutely understand wanting to

10   confer with your client on that issue.  The only issue is,

11   because I am not asking you for the purposes of the entire

12   case which would warrant the particular, I think it is a

13   one-sentence filing that you would make in the event that you

14   are consenting to the entire case, but the consent on the

15   record if that is something that you do intend to give,

16   particularly if it is only for injunctive relief --

17           MR. THAMES:  Your Honor?

18           THE COURT:  Yes.

19           MR. THAMES:  Your Honor, I was going to say,

20   Counsel and I have been attempting to discuss it on email

21   while you were talking, but we do need to have our client

22   sign off before we can actually make that representation,

23   but -- and I may be stepping a little too far with my

24   co-Counsel here, but I believe we could probably file

25   something, a notice with the Court today, informing Your

1  Honor of that decision.  We just need blessing before we do
2  something that --
3          THE COURT:  Yeah.  I understand that.
4          MR. KEARNEY:  I agree with Mr. Thames in terms of
5  that is what we would like to do.
6          THE COURT:  All right.  And I will say that in our
7  consent form that Mr. Thames is familiar with and is on the
8  District's web page, it is for a general consent.  That
9  language can be modified that you want to limit it only for
10 the purposes of consideration of the preliminary injunction.
11 And so I will just -- I will just wait to hear from
12 Defendants on that issue.
13         Mr. Moates, do you want to do the same thing, or do
14 you want to tell me now?
15         MR. MOATES:  I filed, I believe, already with the
16 Court my approval for the entire case with you.
17         THE COURT:  Okay.
18         MR. MOATES:  And I stand by that.
19         THE COURT:  Okay.  I do need both parties -- or all
20 parties involved to consent.  Otherwise, the case will
21 proceed as it is.
22         MR. MOATES:  Yes, ma'am.
23         THE COURT:  And so with that issue being addressed,
24 we will stand adjourned.  Thank you all.
25         MR. THAMES:  Thank you, Your Honor.

1             MR. JORDAN:  Thank you.

2             MR. MOATES:  Thank you.

3             MR. THAMES:  I hope your family is doing well.

4             THE COURT:  Thank you.

5             (Video hearing adjourned.)

6

7                         CERTIFICATION

8

9             I HEREBY CERTIFY that the foregoing is a true

10   and correct transcript from the video recording of the

11   proceedings in the above-entitled matter to the best of my

12   ability.

13

14   /s/ Shea Sloan _____                January 25, 2021
     SHEA SLOAN, CSR, RPR
15   TRANSCRIBER

16

17

18

19

20

21

22

23

24

25