# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF TEXAS
### SHERMAN DIVISION

| | | |
|---|---|---|
| **MICHAEL MOATES,** | § | |
| | § | |
| **Plaintiff,** | § | |
| | § | |
| **v.** | § | Civil Action No. 4:20-cv-896-ALM-KPJ |
| | § | |
| **FACEBOOK INC.,** | § | |
| | § | |
| **Defendant.** | § | |
| | § | |

## REPORT AND RECOMMENDATION
## OF UNITED STATES MAGISTRATE JUDGE

Pending before the Court is Defendant Facebook Inc.'s ("Facebook") Motion to Transfer Pursuant to 28 U.S.C. § 1404(a) (the "Motion") (Dkt. 29), wherein Facebook requests this action be transferred to the Northern District of California pursuant to three forum selection clauses. On March 3, 2021, Plaintiff Michael Moates ("Plaintiff") filed a response (Dkt. 37), to which Facebook filed a reply (Dkt. 39). Having considered the arguments and applicable authorities, the Court recommends the Motion (Dkt. 29) be **GRANTED**.

## I.     BACKGROUND

On November 19, 2020, Plaintiff filed an Original Complaint (Dkt. 1) against Facebook, which was superseded by a First Amended Complaint (Dkt. 5) and a Second Amended Complaint (Dkt. 20).[1] In his forty-seven paged Second Amended Complaint (Dkt. 20), Plaintiff represents he operates online Facebook Pages and Groups, through which he facilitates "likes, followers, and engagement." *See* Dkt. 20 at 9. Since August 29, 2020, Plaintiff "invested" $10,546.00 in

---

[1] This action originally included another co-plaintiff and three other defendants; however, they are no longer live before the Court. *See* Dkt. 1; Dkt. 5; Dkt. 26 at 2 n.1.

advertising to build a following of users who would like, follow, and engage with content hosted by the social media platform. *Id.*

Facebook subsequently terminated Plaintiff's access to his Facebook, Instagram, WhatsApp, Oculus, and CrowdTangle accounts, as Facebook alleges Plaintiff's accounts "represent[ed]" QAnon, and Plaintiff's activities violated Facebook's community standards. *See* Dkt. 20 at 10–13; Dkt. 20-3; Dkt. 20-5; Dkt. 20-18. Plaintiff then initiated this lawsuit, wherein he asserts a panoply of claims. Plaintiff alleges violations of the following constitutional, statutory, and regulatory provisions:

(1)   "Right to privacy" under the Texas Constitution, though Plaintiff does not specify which "zone of privacy" was violated;[2]

(2)   Violations of the Texas Business and Commerce Code, namely TEX. BUS. & COM. CODE § 17.41 *et seq.* (deceptive trade practice) and § 503.001 (unlawful capture or use of biometric identifier);

(3)   Texas Student Privacy Act, TEX. EDUC. CODE § 32.152;

(4)   Texas Medical Records Privacy Act, TEX. HEALTH & SAFETY CODE § 181.001 *et seq.*;

(5)   "Uniform Trade Secrets Act," presumably the Texas Uniform Trade Secrets Act ("TUTSA"), TEX. CIV. PRAC. & REM. CODE § 134A.001 *et seq.*;

(6)   Section 2 of the Sherman Act of 1890, 15 U.S.C. § 2;

(7)   Section 7 of the Clayton Act of 1914, 15 U.S.C. § 18;

---

[2] The Texas Constitution contains no express guarantee of a right to privacy. *See Texas State Emps. Union v. Texas Dep't of Mental Health & Mental Retardation*, 746 S.W.2d 203, 205 (Tex. 1987). However, the Texas Supreme Court has recognized that the Texas Constitution contains provisions that implicitly create protected "zones of privacy," and as such, the "right to privacy" can generally be described as the right to be free from "unreasonable government intrusions and unwarranted interference with personal autonomy." *See id.* at 205; *Bell v. Low Income Women of Tex.*, 95 S.W.3d 253, 265 (Tex. 2002). Because "personal autonomy" is a rather broad concept, the Texas Supreme Court has discussed this right in an array of contexts. *See Texas State Emps. Union*, 746 S.W.2d at 204–05 (discussing right in context of mandatory polygraph policy); *Bell*, 95 S.W.3d at 264–65 (discussing right in context of indigent women seeking abortions); *City of Sherman v. Henry*, 928 S.W.2d 464, 465, 474 (Tex. 1996) (discussing right where police officer's sexual affair precluded his promotion); *State v. Morales*, 869 S.W.2d 941, 942 (Tex. 1994) (discussing right in context of anti-sodomy statute).

(8)   Regulation FD of the Securities Exchange Act of 1934 ("Exchange Act"), 15 U.S.C. § 78a *et seq.*; 17 C.F.R. § 243.100 *et seq.*;

(9)   Lanham Act, also known as the Trademark Act of 1946, 15 U.S.C. § 1051 *et seq.*;

(10)  Regulation E of the Electronic Fund Transfer Act of 1978, 15 U.S.C. § 1693 *et seq.*; 12 C.F.R. §§ 1005.1–1005.36;

(11)  Federal Educational Rights and Privacy Act of 1974 ("FERPA"), 20 U.S.C. § 1232g *et seq.*;

(12)  Title III of the American Disabilities Act of 1990 ("ADA"), 42 U.S.C. § 12181 *et seq.*;

(13)  Health Insurance Portability and Accountability Act of 1996 ("HIPPA"), 42 U.S.C. § 1320d-1 *et seq.*; 45 C.F.R. § 160.001 *et seq.*; and

(14)  18 U.S.C. § 594 (Intimidation of Voters).

*See* Dkt. 20.

Plaintiff also asserts claims of common law fraud, common law breach of contract, and "data theft," though the Court is unaware on what legal basis the "data theft" claim arises. *Id.* Lastly, Plaintiff argues Section 230 the Communications Decency Act of 1996, 47 U.S.C. § 230, is unconstitutional under the First Amendment. *Id.* at 16.

On February 3, 2021, Facebook filed the present Motion, wherein it requests that this matter be transferred to the Northern District of California pursuant to three forum selection clauses. *See* Dkt. 29 at 3. Facebook represents Plaintiff registered two Facebook accounts—one in 2014 and one in 2017. *See id.* at 2. From 2014 (when Plaintiff first registered a Facebook account) to 2020 (when Plaintiff lost access to his accounts), three different terms of service (collectively, the "Terms of Service") with nearly identical forum selection clauses and choice of law provisions were in place. *See id.* at 2–3; Dkt. 29-1; Dkt. 29-2 at 2, 7; Dkt. 29-3 at 2, 4; Dkt. 29-4 at 5.[3] The

---

[3] While the first two Terms of Service are entitled "Statement of Rights and Responsibilities," Facebook's affidavit explains they are in fact Terms of Service. *See* Dkt. 29-1 at 2; Dkt. 29-2 at 2; Dkt. 29-3 at 2.

first and second Terms of Service, dated November 15, 2013 and January 30, 2015, respectively, have identical forum selection clauses and choice of law provisions. *See* Dkt. 29-2 at 2, 7; Dkt. 29-3 at 2, 4. They provide:

> You will resolve any claim, cause of action or dispute (claim) you have with us arising out of or relating to [these Terms] or Facebook exclusively in the U.S. District Court for the Northern District of California or a state court located in San Mateo County, and you agree to submit to the personal jurisdiction of such courts for the purpose of litigating all such claims. The laws of the State of California will govern this Statement, as well as any claim that might arise between you and us, without regard to conflict of law provisions.

*Id.*

> The third Terms of Service, dated October 1, 2020, provides:

> For any claim, cause of action, or dispute you have against us that arises out of or relates to these Terms or the Facebook Products ("claim"), you agree that it will be resolved exclusively in the U.S. District Court for the Northern District of California or a state court located in San Mateo County. You also agree to submit to the personal jurisdiction of either of these courts for the purpose of litigating any such claim, and that the laws of the State of California will govern these Terms and any claim, without regard to conflict of law provisions.

Dkt. 29-4 at 6, 7.

On March 3, 2021, Plaintiff filed a response (Dkt. 37), to which Facebook filed a reply (Dkt. 39).

## II. <u>LEGAL STANDARD</u>

### A.  TRANSFER PURSUANT TO A FORUM SELECTION CLAUSE

Because a forum selection clause represents the parties' agreement as to the most proper forum, "a valid forum selection clause [should be] given controlling weight in all but the most exceptional cases." *Atlantic Marine Constr. Co., Inc. v. U.S. Dist. Ct. for the W. Dist. of Tex.*, 571 U.S. 49, 63 (2013) (quoting *Stewart Org., Inc. v. Ricoh Corp.*, 487 U.S. 22, 33 (1988) (Kennedy, J., concurring)). Such clauses are enforced through a motion to transfer venue under 28 U.S.C. §

1404(a). *See id.* at 59. Under § 1404(a), a district court may transfer any civil case "[f]or the convenience of parties and witnesses, in the interest of justice, . . . to any other district or division where it might have been brought or to any district or division to which all parties have consented." *See id.* To determine whether transfer is appropriate, the Court determines: (1) whether the forum selection clause is valid and enforceable; (2) whether the forum selection clause is mandatory or permissive; (3) whether the plaintiff's claims fall within its scope; and (4) whether extraordinary circumstances counsel against transfer. *See Coleman v. Brozen*, No. 4:19-cv-705-ALM, 2020 WL 2200220, at *2–3 (E.D. Tex. May 6, 2020).

## B.  CHOICE OF LAW

When conducting a forum selection clause analysis, courts must ensure they apply the proper substantive law at each step. *See Sabal Ltd. LP v. Deutsche Bank AG*, 209 F. Supp. 3d 907, 918–19 (2016) (reprimanding federal district and circuit courts for "inelegant and confusing" legal analysis regarding forum selection clauses). In the Fifth Circuit, district courts apply federal law to determine the enforceability of forum selection clauses in both diversity and federal question cases. *See Barnett v. DynCorp Int'l, LLC*, 831 F.3d 296, 301–02 (5th Cir. 2016).

With respect to the mandatory or permissive nature of the forum selection clause and whether a plaintiff's claims fall under the forum selection clause's scope, federal courts first apply the choice of law rules of the state in which it sits. *Weber v. PACT XPP Techs., AG*, 811 F.3d 758, 771 (5th Cir. 2016); *Sabal*, 209 F. Supp. 3d at 919. The applicable substantive law then guides these steps of the analysis. *See id.*

### III.  ANALYSIS

The Court begins with a choice of law analysis to ascertain the applicable state law for the second and third steps of the forum selection clause analysis, as articulated in *Atlantic Marine. See Sabal*, 209 F. Supp. 3d at 919; *Unique Dev. Grp., LLC v. Normandy Cap. Tr. & Cohen Fin.*, No. 4:18-cv-4542, 2021 WL 1027570, at *2 (S.D. Tex. Mar. 17, 2021).

### A.  CHOICE OF LAW

A federal court sitting in diversity must apply the choice of law rules of the forum state. *Mayo v. Hartford Life Ins. Co.*, 354 F.3d 400, 403 (5th Cir. 2004). Here, the forum state is Texas. Texas applies the "most significant relationship" test from the Second Restatement of Conflicts to decide choice of law issues. *See id.*; *Torrington Co. v. Stutzman*, 46 S.W.3d 829, 848 (Tex. 2000); Restatement (Second) of Conflict of Laws §§ 6, 145 (Am. L. Inst. 1971). Under the most significant relationship test, contractual choice of law provisions will apply to claims pertaining to the instrument. *Smith v. EMC Corp.*, 393 F.3d 590, 597 (5th Cir. 2004). However, Texas courts will not enforce choice of law provisions if the law of the chosen state violates a fundamental public policy of Texas or the contract bears no reasonable relation to the chosen state. *See Exxon Corp. v. Burglin*, 4 F.3d 1294, 1298 n.5 (5th Cir. 1993) (citing *DeSantis v. Wackenhut Corp.*, 793 S.W.2d 670, 677 (Tex. 1990), *cert. denied*, 498 U.S. 1048 (1991)).

Here, the Terms of Service provide California law "will govern" claims arising between the parties. *See* Dkt. 29-2 at 7; Dkt. 29-3 at 4; Dkt. 29-4 at 6. Because Facebook is headquartered in California, *see* Dkt. 29 at 2, the Terms of Service bear a reasonable relation to California. *See Marquis Software Sols, Inc. v. Robb*, No. 3:20-cv-372-B, 2020 WL 955901, at *4 (N.D. Tex. Feb. 27, 2020). Further, the parties do not identify an aspect of California law that violates a fundamental public policy of Texas. Accordingly, California law will guide the Court's analysis

as to the second and third portions of the Court's *Atlantic Marine* analysis: the mandatory nature of the forum selection clauses and whether Plaintiff's claims fall under the forum selection clauses' scope. *See Exxon Corp.*, 4 F.3d at 1298.

## B.    VALIDITY AND ENFORCEABILITY

Courts apply federal law to determine the validity and enforceability of a forum selection clause. *See Alliance Health Grp., LLC v. Bridging Health Options, LLC*, 553 F.3d 397, 399 (5th Cir. 2008). In the Fifth Circuit, "[a] forum selection provision in a written contract is *prima facie* valid and enforceable unless the opposing party shows that enforcement would be unreasonable." *Kevlin Servs., Inc. v. Lexington State Bank*, 46 F.3d 13, 15 (5th Cir. 1995). The party opposing enforcement bears a "heavy burden" to establish unreasonableness. *See Carnival Cruise Lines, Inc. v. Shute*, 499 U.S. 585, 592 (1991). Unreasonableness potentially exists where: (1) the incorporation of the forum selection clause to the agreement was the product of fraud or overreaching; (2) the party seeking to escape enforcement will practically be deprived of his day in court due to the grave inconvenience or unfairness of the selected forum; (3) the fundamental unfairness of the chosen law will deprive the plaintiff of a remedy; and (4) enforcement of the forum selection clause would contravene a strong public policy in the forum state. *See Haynsworth v. The Corp.*, 121 F.3d 956, 963 (5th Cir. 1997).

Here, Plaintiff argues enforcing the forum selection clauses would pose grave difficulties and would violate the public policies of Texas. *See* Dkt. 37.

### 1.    Grave Inconvenience of the Selected Forum

Because the inconvenience of a forum is foreseeable at the time of contracting, invalidating a forum selection clause due to a grave inconvenience requires the resisting party to show he will, for all practical purposes, be deprived of his day in court. *See Haynsworth*, 121 F.3d at 963;

*Mendoza v. Microsoft, Inc.*, 1 F. Supp. 3d 533, 545 (W.D. Tex. 2014). Essentially, the resisting party must show it is impossible for the party to try the case, and litigating in another forum will require the party to abandon his claims. *See Pratt v. Silversea Cruises, Ltd.*, No. C 05-0693 SI, 2005 WL 1656891, at *4 (N.D. Cal. July 13, 2005); *O'Hollaren v. Hill-Rom Co., Inc.*, No. CV 08-45-ST, 2008 WL 3853350, at *7 (D. Ore. Aug. 14, 2008).

In *Walker v. Carnival Cruise Lines*, 107 F. Supp. 2d 1135 (N.D. Cal. 2000), for example, the court found enforcing a forum selection clause would pose grave difficulties on two plaintiffs. *Id.* at 1136, 1141–42. Both plaintiffs had such limited financial means that travel to another state would have been prohibitively expensive. *See id.* at 1141. One plaintiff received less than $400 a month in disposable income to provide for herself, her husband, and two children. *Id.* The other plaintiff received less than $700 per month to provide for himself and three family members. *Id.* On average, a plane ticket from Northern California to Florida cost $490, and a train ticket cost $1,858. *Id.* at 1140–41. The court found the plaintiffs would experience extreme financial hardship if required to litigate out of state. *Id.* at 1141.

The *Walker* court also noted both plaintiffs lived with severe disabilities. *Id.* One plaintiff suffered from chronic progressive multiple sclerosis, and the other lived with quadriplegia. *Id.* Both plaintiffs were wheelchair bound and suffered from bowel and bladder incontinence. *Id.* Because of their incontinence, the narrow configuration of an airplane or train's restroom precluded the plaintiffs' ability to use such facilities. *Id.* The plaintiffs also reported that, in their prior attempts to travel, they suffered from numerous embarrassing and humiliating incidents, and passengers made condescending remarks to them as a result of these incidents. *Id.* On these facts, the court did not enforce the forum selection clause. *See id.*; *see also Murphy v. Schneider Nat'l, Inc.*, 362 F.3d 1133, 1137, 1142–43 (9th Cir. 2004) (holding grave difficulty existed where the

plaintiff was elderly, disabled, had no disposable income, could not drive due to disabilities, and the plaintiff's wife could not drive him due to her own disabilities).

Here, Plaintiff contends he cannot travel due to asthma, sleep apnea, anxiety, attention deficit hyperactivity disorder, binge eating disorder, and insomnia. *See* Dkt. 37 at 1. In his affidavit, Plaintiff testifies he has "been rushed to the emergency room multiple times during the coronavirus pandemic for concern while struggling to breath." Dkt. 37-1 at 1. He further testifies that wearing a mask once induced him to cough until his face was purple and his anxiety regarding travel puts him at risk of experiencing these difficulties. *See* Dkt. 37-1. Plaintiff did not provide the Court with any financial information.[4]

Having reviewed the record, the Court finds Plaintiff has not met the heavy burden of showing travel to Northern California constitutes a grave difficulty. Plaintiff states he was hospitalized multiple times during the coronavirus pandemic, but he only submits one hospital record dated May 14, 2020. *See* Dkt. 37-3. The hospital record states Plaintiff's reason for visiting is "SOB/COUGH," *id.*, which the Court construes as "shortness of breath" and coughing. *See Jimenez v. Wynne*, No. 9:16-cv-2, 2019 WL 1141939, at *5 (E.D. Tex. Jan. 16, 2019). The hospital record merely states Plaintiff may have a COVID-19 infection and/or pneumonia, rather than stating Plaintiff actually had an infection or pneumonia. Dkt. 37-3. Beyond this sparse information,

---

[4] In his response, Plaintiff also raises arguments concerning the doctrines of impossibility of performance and frustration of performance, though he does not tether these doctrines to any portion of the forum selection clause analysis. *See* Dkt. 37 at 4. Generally, once a breach of contract case reaches the underlying merits, if a party can establish the doctrines of impossibility or frustration of performance apply, the party is discharged from performing under the contract. *See In re CEC Ent., Inc.*, 625 B.R. 344, 357–64 (Bankr. S.D. Tex. 2020) (describing the doctrines under various state law regimes). Because Plaintiff's argument concerning these doctrines involves his purported medical conditions, alleged inability to wear a mask, and the "impossibility" of flying, the Court construes these arguments as duplicative of his "grave inconvenience" argument and, thus, will not discuss them further herein.

Plaintiff also advances an argument concerning a force majeure clause in "Section 12 of the Facebook Advertising Terms and Conditions." *See* Dkt. 37 at 3–4. Plaintiff argues "he cannot be held liable for 'the acts of God' or the coronavirus pandemic." *Id.* at 3. Plaintiff's argument misses the mark. At this juncture, Facebook has not filed a counterclaim to hold Plaintiff liable for anything and, thus, the force majeure clause has no relevance to the pending Motion.

the hospital record contains no physician notes, observations, diagnosis, or post-visit instructions. *Id.* On this record, the Court is not convinced a report documenting one visit to a medical facility, with no narrative or elaboration, demonstrates Plaintiff will have to relinquish his claims if he has to litigate his claims in the Northern District of California. *See O'Hollaren*, 2008 WL 3853350, at *7.

Additionally, Plaintiff's claim that he "may" experience anxiety and shortness of breath if he were to wear a mask and board a plane is too speculative. *See Murphy*, 362 F.3d at 1137, 1142–43; *Walker*, 107 F. Supp. 2d at 1141–42. Plaintiff alleges that on one occasion, a mask caused him to cough until his face was purple. *See* Dkt. 37-1. One adverse experience with wearing a mask after more than a year of a global pandemic does not convince the Court that he cannot fly to Northern California and litigate his claims. Moreover, Plaintiff has not established he is unable to drive to California. *See Murphy*, 362 F.3d at 1137, 1142–43. On this record, Plaintiff has failed to show he will experience grave difficulties if required to travel to Northern California. *See Fteja v. Facebook, Inc.*, 841 F. Supp. 2d 829, 844 (S.D.N.Y. 2012) (finding an inner ear disorder associated with spinning and dizziness does not preclude a party from flying); *Earll v. eBay, Inc.*, Dkt. 20 at 14, 764 F. Supp. 2d 1148, 1150 (W.D. Mo. 2011) (finding no grave difficulty where the plaintiff was deaf and needed a service animal to travel by airplane); *Universal Grading Serv. v. eBay, Inc.*, No. 08-cv-3557 (CPS), 2009 WL 2029796, at *19 (E.D.N.Y. June 10, 2009) (finding no grave difficulty where party had severe coronary artery disease, hypertension, and a prostate condition); *Rimkus Consulting Grp., Inc. v. Rault Resources, Inc.*, No. H-07-1494, 2008 WL 901483, at *8 (S.D. Tex. Mar. 31, 2008) (finding no grave difficulty where party could not fly due to surgery for a detached retina, as party did not indicate how long the no-fly instruction would last and party could still drive); *Hesterly v. Royal Caribbean Cruises, Ltd.* No. 06-3206-CV-S-RED, 2006 WL

2948082, at *4 (W.D. Mo. Oct. 16, 2006) (finding no grave difficulty where physician did not clear the plaintiff to fly because of injured leg and the plaintiff did not provide financial information).

### 2. Texas Public Policy

Though Plaintiff's response contains no heading discussing violations of Texas public policy, he nevertheless argues the forum selection clauses should not be enforced because (1) some of his claims arise under Texas statutes, (2) Texas does not have a mask mandate, and (3) the Terms of Service are adhesion contracts. *See* Dkt. 37 at 4–5. Plaintiff advances the first two arguments under a heading titled "Public Interest Factor." However, Plaintiff's actual argument discusses grave inconvenience and how travel "would be contrary to public policy." *Id.* Plaintiff's third argument lies under a heading titled "Exceptional Case." The Court construes these three arguments as advancing reasons why enforcing the forum selection clauses would violate Texas public policy. As explained below, these arguments are unavailing.

#### a. *Claims arising under Texas statutes*

Plaintiff's response merely states, "Texas statutes are being evaluated." *Id.* at 4. Plaintiff seems to assert the following: Because some claims arise under Texas law, this case should not be transferred to California. This argument is misguided. Texas state courts and Texas federal courts do not have a monopoly on adjudicating Texas constitutional, statutory, and common law claims. In fact, "federal judges routinely apply the law of a State other than the State in which they sit." *Atlantic Marine*, 571 U.S. at 67. It is unpersuasive to argue a federal judge sitting in California applying Texas law violates Texas public policy.

### b.   Texas's lack of a mask mandate

Plaintiff's response states, "[A]s of this filing the State of Texas does NOT have a mask mandate in place . . . Texas is a 100% open [state] with no plans to close down." *Id.* at 4. Plaintiff's contention refers to Governor Abbott's Executive Order GA-34, which ended pandemic-related restrictions for various establishments and the statewide mask mandate in Texas. *See* The Governor of the State of Texas, Executive Order No. GA-34, 46 Tex. Reg. 1,567 (Mar. 2, 2021). Plaintiff's reasoning seems to proceed as follows: Because Executive Order GA-34 lifts the mandate that private individuals wear a mask, engage in social distancing, or comply with other public health measures, *see id.* at 1,567–68, requiring Plaintiff to board a plane, wear a mask, and appear in a California federal court violates Texas public policy. *See* Dkt. 37 at 4–5.

This argument is wholly unsupported by the Executive Order. The Executive Order states, "[I]ndividuals are strongly encouraged to wear face coverings" and "Nothing in this executive order precludes businesses or other establishments from requiring employees or customers to follow additional hygiene measures, including the wearing of a face covering." *Id.* at 1,568. The Executive Order GA-34 merely states the Texas gubernatorial branch will no longer use its authority to require individuals to adhere to certain public health protocols, but establishments may still impose such restrictions, so long as such restrictions do not run afoul of another law.

### c.   Adhesion contract

Plaintiff contends the three Terms of Service are adhesion contracts, arguing he agreed to the Terms of Service due to "an absence of meaningful choice." *See* Dkt. 37 at 5–6. According to Plaintiff, the Terms of Service are unconscionable, and the forum selection clauses contained therein should not be enforced. *Id.*

Both Texas and California law define adhesion contracts as standardized forms offered on a "take it or leave it" basis without affording the consumer a realistic opportunity to bargain. *See Fluor Western, Inc. v. G & H Offshore Towing Co.*, 447 F.2d 35, 38–40 (5th Cir. 1971); *Nagrampa v. MailCoups, Inc.*, 469 F.3d 1257, 1281 (9th Cir. 2006); *Grosser v. Red Mango Fc, LLC*, No. 3:21-cv-2691-N, 2013 WL 12134086, at *7 (N.D. Tex. Apr. 25, 2013). Because Plaintiff appears to argue the Terms of Service, as adhesion contracts, contravene Texas public policy, the Court analyzes the Terms of Service under Texas law.

In Texas, an adhesion contract is not automatically unconscionable, unenforceable, or void. *See In re AdvancePCS Health LP*, 172 S.W.3d 603, 608 (Tex. 2005); *In re Lyon Fin. Servs., Inc.*, 257 S.W.3d 228, 233 (Tex. 2000); *Dillard v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 961 F.2d 1148, 1154 (5th Cir. 1992). "The principles of unconscionability do not negate a bargain because one party to the agreement may have been in a less advantageous bargaining position." *In re Palm Harbor Homes, Inc.*, 195 S.W.3d 672, 679 (Tex. 2006). "[W]e consider whether a contract results in unfair surprise or oppression. . . . [P]arties to a contract have an obligation to protect themselves by reading what they sign and, absent a showing of fraud, cannot excuse themselves from the consequence of failing to meet that obligation." *In re Lyon*, 257 S.W.3d at 233.

Here, the Court does not discern any unfair surprise or oppression. The forum selection clauses were not deceptively placed or sized, and Plaintiff could have easily read the Terms of Service and discovered them. *See In re Lyon*, 257 S.W.3d at 233 (no surprise where terms were in all capital letters); *Pugh v. Arrow Elecs., Inc.*, 304 F. Supp. 2d 890, 895 (N.D. Tex. 2003) (no unfair surprise where forum selection clause was printed in a suitable font size and placed right above signature block); *Fteja*, 841 F. Supp. 2d at 839 (finding "it is not too much to expect" an Internet user would click Facebook's hyperlinked Terms of Use and read it). Likewise, there is no

13

indication that Facebook set California as the forum to discourage plaintiffs from pursuing legitimate claims. *See Shute*, 499 U.S. at 595. Finally, the Court is further persuaded by the reasoning of other federal courts that have upheld Facebook's forum selection clauses. *See Franklin v. Facebook, Inc.*, No. 1:15-cv-655-LMM, 2015 WL 7755670, at *2 (N.D. Ga. Nov. 24, 2015) ("[T]he forum selection clause contained has been addressed by numerous courts in actions involving [Facebook]. The Court cannot identify a single instance where any federal court has struck down [Facebook's Terms] as an impermissible contract of adhesion . . . ."). Because the Terms of Service are not unconscionable under Texas law, enforcing them does not violate Texas public policy. *See In re Palm Harbor*, 195 S.W.3d at 679.

## C.   MANDATORY OR PERMISSIVE

The Court now determines whether the forum selection clauses are mandatory or permissive under California law. If venue is specified with mandatory language, the forum selection clause will be enforced. *See Ten-X, Inc. v. Pasha Realty Holdings, LLC*, No. SACV 20-02004JVS(ADSx), 2021 WL 971153, at *6 (C.D. Cal. Mar. 3, 2021). If venue is specified as permissive, the forum selection clause will not be enforced. *See id.*

"To be mandatory, a clause must contain language that clearly designates a forum as the exclusive one." *Northern Cal. Dist. Council of Laborers v. Pittsburg-Des Moines Steel Co.*, 69 F.3d 1034, 1037 (9th Cir. 1995). In California, where a forum selection clause uses the word "exclusively" or "exclusive," the forum selection clause is mandatory. *See Berg v. MTC Elecs. Techs. Co.*, 71 Cal. Rptr. 2d 523, 530 (Cal. Ct. App. 1998) ("[L]anguage giving exclusive jurisdiction to the forum is required."); *Hunt Wesson Foods, Inc. v. Supreme Oil Co.*, 817 F.2d 75, 77–78 (9th Cir. 1987) (noting forum selection clause that confers exclusive jurisdiction in a forum is mandatory).

Here, the November 15, 2013 and January 30, 2015 Terms of Service state, "You will resolve any claim . . . arising out of or relating to this Statement or Facebook *exclusively* in the U.S. District Court for the Northern District of California or a state court located in San Mateo County and you agree to submit to the personal jurisdiction of such courts for the purpose of litigating all such claims." Dkt. 29-2 at 7; Dkt. 29-3 at 4 (emphasis added). Similarly, the October 1, 2020 Terms of Service state, "You will resolve any claim . . . *exclusively* in the U.S. District Court for the Northern District of California or a state court located in San Mateo County . . . ." Dkt. 29-4 at 5 (emphasis added). The forum selection clauses are mandatory. *See Berg*, 71 Cal. Rptr. 2d at 530; *Hunt Wesson Foods,* 817 F.2d at 77–78.

### D.   SCOPE

Next, the Court examines whether, under California law, Plaintiff's causes of actions fall under the Terms of Services' scope.

Under California law, a "broad" clause contains language such as "any claim arising from or related to this agreement" or "arising in connection with the agreement." *See Howard v. Goldbloom*, 241 Cal. Rptr. 3d 743, 746 (Cal. Ct. App. 2018) (italics removed). Broadly worded clauses will encompass tort claims that may arise under, or from, the contractual relationship. *See id.*; *Olinick v. BMG Ent.*, 42 Cal. Rptr. 3d 268, 278 (Cal. Ct. App. 2006) (holding "all disputes arising under this Agreement" encompasses all causes of action arising from or related to the agreement regardless of how they are categorized). "There is no requirement that the cause of action arising out of a contractual dispute must be itself contractual. At most, the requirement is that the dispute must arise out of the contract." *Rice v. Downs*, 203 Cal. Rptr. 3d 555, 563 (Cal. Ct. App. 2016) (italics removed). In other words, broad clauses will encompass allegations that

"touch matters" covered by the contract. *See Ramos v. Superior Ct.*, 239 Cal. Rptr. 3d 679, 689 (2018).

Here, two Terms of Service require Plaintiff to litigate  "any claim, cause of action or dispute" "arising out of or relating to this [the Terms of Service] or Facebook." Dkt. 29-2 at 7; Dkt. 29-3 at 4. The third (and most recent) Terms of Service contains these provisions nearly word for word, though the forum selection clause encompasses claims arising out of, or relating to, "Facebook Products" rather than just "Facebook." Dkt. 29-4 at 6. Thus, all three Terms of Service contain broad forum selection clauses, and the  forum selection clauses will apply to  Plaintiff's contractual claims, his tort claims arising from the contractual claims, and all claims that "touch" the Terms of Service or Facebook products. *See Ramos*, 239 Cal. Rptr. 3d at 689.

Although Plaintiff's claims extend to many areas of the law, all of his claims fall under the forum selection clauses' scope. His Texas law, Sherman Act, Clayton Act, Lanham Act, FERPA, ADA, HIPPA,  Regulation E,  Regulation FD, common law fraud, breach of contract, and "data theft" claims all concern his Facebook accounts, his activities conducted while using the accounts, Facebook's collection of information from his online activities, the termination of his  accounts, and Facebook's allegedly fraudulent acts. *See* Dkt. 20. For example, Plaintiff's fraud and breach of contract claims are based on his allegations that Facebook disabled his accounts after charging him for advertising, which caused him to lose an audience and anticipated revenue. *See* Dkt. 20 at 33–34. These claims "touch matters" concerning the Terms of Service. *Ramos*, 239 Cal. Rptr. 3d at 689.

Moreover, Plaintiff's allegation that Section 230 of the Communications Decency Act is unconstitutional and that Facebook intimidated voters in violation of 18 U.S.C. § 594 relate to

Facebook and its products. *See* Dkt. 20 at 16, 23. These claims also fall under the forum selection clauses' scope.

### E.   EXTRAORDINARY CIRCUMSTANCES

If a forum selection clause is valid, mandatory, and encompasses the plaintiff's claims, the court must then determine whether any extraordinary circumstances unrelated to the convenience of the parties warrant denial of transfer. *Sabal*, 209 F. Supp. 3d at 924. In making this determination, the court considers "public interest factors" such as: (1) administrative difficulties flowing from court congestion; (2) the local interest in having localized interests decided at home; (3) the familiarity of the forum with the law that will govern the case; and (4) the avoidance of unnecessary problems of conflict of laws of the application of foreign law. *Atlantic Marine*, 571 U.S. at 64; *Weber*, 811 F.3d at 776. The party resisting the forum selection clause "must bear the burden of showing that public interest factors *overwhelmingly* disfavor a transfer." *Atlantic Marine*, 571 U.S. at 67 (emphasis added). Practically, the forum selection clause should control except in unusual cases. *Id.* at 64.

#### 1.   Administrative Difficulties Flowing from Court Congestion

This factor considers "not whether transfer will reduce a court's congestion, but whether a trial may be speedier in another court because of its less crowded docket." *Hillestad v. LLOG Expl. Co., LLC*, No. 3:17-cv-341, 2018 WL 4938708, at *7 (S.D. Tex. Sept. 20, 2018) (cleaned up), *report and recommendation adopted*, 2018 WL 4931783 (S.D. Tex. Oct. 11, 2018). Of the four public interest factors, this factor "appears to be the most speculative," and it alone should not outweigh the other public interest factors. *Frito-Lay N. Am., Inc. v. Medallion Foods, Inc.*, 867 F. Supp. 2d 859, 871 (E.D. Tex. 2012).

For a twelve-month period ending in September 30, 2020, judges in the Eastern District of Texas had approximately 392 civil cases per judgeship, with a median time of 8.9 months for disposing a civil case.[5] For the Northern District of California, there were approximately 639 civil cases per judgeship, with a median time of 11.4 months for disposing a civil case.[6] Because the Eastern District of Texas has fewer cases per judgeship and disposes of cases faster than the Northern District of California, this factor weighs against transfer. *See Frito-Lay*, 867 F. Supp. 2d at 871–72 (finding this factor weighs in favor of the federal district with fewer cases per judge); *Hanby v. Shell Oil Co.*, 144 F. Supp. 2d 673, 679 (E.D. Tex. 2001) (same, but for a division of a federal district).

## 2.    Local Interests in Having Localized Interests Decided at Home

The second public interest factor is the "local interest in having localized interests decided at home." *In re Volkswagen of America, Inc.*, 545 F.3d 304, 315, 317–18 (5th Cir. 2008). This factor "generally favors where the acts giving rise to the lawsuit occurred." *Metromedia Steakhouses Co. v. BMJ Foods P.R., Inc.*, No. 3:07-cv-2042-D, 2008 WL 794533, at *3 (N.D. Tex. Mar. 26, 2008). Further, a "judicial district's local interest in a case is strong 'when the cause of action calls into question the work and reputation of several individuals residing in or near the district who presumably conduct business in that community.'" *Zix Corp. v. Echoworx Corp.*, No. 2:15-cv-1272-JRG, 2016 WL 7042221, at *4 (E.D. Tex. June 9, 2016) (quoting *In re Hoffman-La Roche, Inc.*, 587 F.3d 1333, 1337 (Fed. Cir. 2009)). Here, Facebook is headquartered in California; hence, the Northern District of California has a strong local interest in deciding this case. *See Zix Corp.*, 2016 WL 7042221, at *4; Dkt. 29 at 1.

---

[5]  *See* U.S. District Courts—National Judicial Caseload Profiles, UNITED STATES DISTRICT COURTS, https://www.uscourts.gov/sites/default/files/data_tables/fcms_na_distprofile0930.2020.pdf.

[6]  *See id.*

Regarding local interests in Texas, Plaintiff does not allege any non-party witness resides in Texas, or that the case calls into question the work and reputation of any other individual residing in the Eastern District of Texas. *See Zix Corp.*, 2016 WL 7042221, at *4 (finding factor weighs neutrally where one party was headquartered in transferee district party and the majority of non-party witnesses reside in transferor district). Nor does Plaintiff allege any issues unique to the local venue, such as water and oil rights. *See Sabal*, 209 F. Supp. 3d at 925. The only connection between this case and the Eastern District of Texas is that Plaintiff himself lives and conducts business in Denton, Texas. *See* Dkt. 20 at 8. While a party's place of residence is not necessarily determinative, it does provide Texas some local interest. *See Perez v. Linkedin Corp.*, No. 4:20-cv-2188, 2020 WL 5997196, at *5 (S.D. Tex. Oct. 9, 2020) (finding this factor weighs neutrally where one party is headquartered in Northern District of California and one party is a resident in the Southern District of Texas); *Sabal*, 209 F. Supp. 3d at 924–25 (A "party's residence does not necessarily establish a truly localized interest."). The Court finds this factor weighs neutrally.

### 3.  Familiarity of the Forum with the Law That Will Govern the Case

This case involves a mix of federal and state law. By the Court's count, Plaintiff has brought six claims arising under Texas law, ten federal claims, two common law claims, and a "data theft" claim of unknown origin. *See* Dkt. 20; *see also supra* Section I. The Northern District of California, as a federal court, is well-equipped to adjudicate the ten federal claims. With respect to the common law claims, the choice of law provisions specifies these claims will be determined under California law. Dkt. 29 at 2. A federal court sitting in California would be more familiar with California law than this Court. *See Abramov v. Otis Elevator Co.*, No. 3:11-cv-440-D, 2011 WL 5081560, at *8 (N.D. Tex. Oct. 25, 2011) (concluding Nevada court would be more familiar with Nevada law, though Texas court was equally capable). However, Plaintiff brings six claims

arising under the Texas Constitution and Texas statutes, with which this Court would be more familiar. *See* Dkt. 20; *Abramov*, 2011 WL 5081560, at *8. Given this array of federal, California, and Texas claims, this factor, at first glance, appears to weigh neutrally.

However, the Court takes judicial notice of other lawsuits filed against Facebook in federal court and subsequently removed to the Northern District of California under the same forum selection clauses. *See, e.g.*, *Kidstar v. Facebook, Inc.*, No. 2:18-cv-13558, 2020 WL 4382279, at *3 n.6, *5 (D.N.J. July 31, 2020); *Loomer v. Facebook, Inc.*, No. 19-cv-80893, 2020 WL 2926357, at *4 (S.D. Fla. Apr. 13, 2020); *Dolin v. Facebook, Inc.*, 289 F. Supp. 3d 1153, 1161 (D. Haw. 2018). Because the Northern District of California is deeply familiar with suits filed against Facebook by its former and current users, the Court finds this factor weighs in favor of transfer. *See Stellar Restoration*, No. 4:20-cv-382-SDJ-KPJ, 2021 WL 1345534, at *19 (E.D. Tex. Mar. 11, 2021) (finding this factor weighs in favor of transfer where the plaintiff regularly brought suit in the Eastern District of Texas under the same formulaic contract), *report and recommendation adopted*, 2021 WL 1185960 (E.D. Tex. Mar. 30, 2021).

### 4.    Avoidance of Unnecessary Conflict of Laws Problems

Finally, there are no conflict of law issues or problems that may arise from the application of foreign law. Because there is no meaningful dispute regarding this factor, the Court finds it weighs neutrally. *See Hanby*, 144 F. Supp. 2d at 679; *Stellar Restoration*, 2021 WL 1345534, at *19.

Thus, one public interest factors weighs in favor of transferring this action to the Northern District of California, one factor weighs against transfer, and two factors weigh neutrally. Because the comparative congestion of the courts is the "most speculative" factor, the Court affords it little

weight. *See Frito-Lay*, 867 F. Supp. 2d at 871. On balance, the Court recommends transferring this action to the Northern District of California.

## IV.   CONCLUSION AND RECOMMENDATION

For the foregoing reasons, the Court recommends Facebook's Motion (Dkt. 29) be **GRANTED**. The Court further recommends that it be **ORDERED** that this matter is transferred to the Northern District of California.

Within fourteen (14) days after service of magistrate judge's report, any party must serve and file specific written objections to the findings and recommendations of the magistrate judge. 28 U.S.C. § 636(b)(1)(C).

A party is entitled to a *de novo* review by the district court of the findings and conclusions contained in this report only if specific objections are made, and failure to timely file written objections to any proposed findings, conclusions, and recommendations contained in this report shall bar an aggrieved party from appellate review of those factual findings and legal conclusions accepted by the district court, except on grounds of plain error, provided that the party has been served with notice that such consequences will result from a failure to object. *Id.*; *Thomas v. Arn*, 474 U.S. 140 (1985); *Douglass v. United Servs. Auto Ass'n*, 79 F.3d 1415, 1417 (5th Cir. 1996) (*en banc*), *superseded by statute on other grounds*, 29 U.S.C. § 636(b)(1) (extending the time to file objections from ten (10) to fourteen (14) days).

**So ORDERED and SIGNED this 14th day of May, 2021.**

_____
KIMBERLY C. PRIEST JOHNSON
UNITED STATES MAGISTRATE JUDGE